# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES BRADLEY HAAG, | 1:07-cv-00856 DLB HC |
|                 Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF RESPONDENT, AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY |
|    v. | |
| JAMES TILTON, Director of Corrections | [Doc. 1] |
|                 Respondent. | |
| _____/ | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.

## BACKGROUND

Following a jury trial in the Fresno County Superior Court, Petitioner was convicted of the following offenses: arson of a structure or forest near Powerhouse Road (Ca. Pen. Code[1] § 451, subd. (c); count 1); possession of flammable material (§ 453, subd. (a); count 2); ex-felon in possession of a firearm (§ 120221, subd. (a)(1); count 3); arson of a structure or forest along Highway 168 (§ 451, subd. (c); count 4); arson of an inhabited structure (§ 451, subd. (b); count 5); and arson of a structure of forest, east of Dunlop (§ 451, subd. (c); counts 6 & 7).  In a bifurcated trial, the trial court found true that Petitioner previously suffered three "strike" convictions and three prior serious felony convictions.

---

[1]  All further statutory references are to the California Penal Code unless otherwise indicated.

1

Petitioner was sentenced to four consecutive terms of 25 years to life, plus 15 consecutive years for the section 667, subdivision (a) enhancements, and was ordered to pay a restitution fine of $10, 000.

Petitioner filed a timely notice of appeal.  With the exception of striking one of the prior convictions and resulting five-year enhancement and staying the execution of the sentences imposed on counts 6 and 7, the Court of Appeal otherwise affirmed the judgment.

Petitioner thereafter filed a petition for review in the California Supreme Court, which was summarily denied on October 13, 2004.

Petitioner filed three state post-conviction collateral petitions.  The first petition was filed in the Fresno County Superior Court on October 3, 2005, and was denied on October 31, 2005. The second petition was filed in the California Court of Appeal, Fifth Appellate District, on November 23, 2005, and denied on August 4, 2006.  The third and last petition was filed in the California Supreme Court on September 28, 2006, and denied on April 11, 2007.

Petitioner filed the instant federal petition for writ of habeas corpus on June 14, 2007. (Court Doc. 1.)  Respondent filed an answer to the petition on January 2, 2008, and Petitioner filed a traverse on February 27, 2008.  (Court Docs. 18, 30.)

STATEMENT OF FACTS[2]

The Highway 168 fire began on Sunday, August 13, 2000, and was extinguished the following Thursday evening. It burned approximately 600 acres and threatened a number of residences.

At approximately 2:00 p.m. on August 13, Kurt Luikart left Shaver Lake to drive down Highway 168 to Prather for lunch. As he passed the bottom of the Four Lane, he saw no fire.[3] However, he observed appellant between one-half and two-thirds of the way up the hill from the turnout, coming down at an angle through the draw. It was an extremely hot day for someone to be on that hill, running; Luikart, who had lived in the area for six years and traveled from Shaver Lake to or past Auberry five days a week, previously had never seen anyone on that hill.  Appellant, who was slightly balding in back and had long, reddish hair

[2] The Court finds the Court of Appeal correctly summarized the facts in its July 6, 2004, opinion lodged by Respondent as Document 4, and located online at 2004 WL 1516773.  Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

[3] The Four Lane is a stretch of Highway 168 that starts near Auberry on the way to Shaver Lake. There is a turnout near a large curve at the bottom of the Four Lane.

that looked dyed, stopped on the hillside by some brush and bent over at the waist with both arms in front of him and his hands almost touching. He was looking at the ground at the base of the bushes. Luikart could not tell whether he had anything in his hands. Although there was nothing of interest that Luikart could see, he assumed appellant was taking a picture of something. Appellant remained in that position for a few seconds, then continued down to a truck that was parked in a turnout area behind the guardrail of the highway. The truck was a burgundy red GMC or Chevrolet with a gold camper shell. Appellant went to the back of the truck and got something out or put something back in. Luikart was "pretty sure" it was a camera. Appellant glanced in Luikart's direction, then turned quickly and went around toward the driver's side of the truck. Luikart continued on to Prather. By the time he left the restaurant, it was readily apparent there was a major fire burning.

Vaughn Talsness was driving up the Four Lane, at what he estimated to be around midday on August 13, when he saw four small fires burning in the vicinity of the turnout by the large curve. Talsness pulled into a turnout a short distance uphill from the curve in order to watch what was happening. There was no fire suppression equipment in the area yet; however, someone pulled in behind him and began taking pictures in the direction of the fire. The person, who had reddish hair, was driving a faded red pickup truck.

Luikart headed home approximately an hour after he passed the location at which he saw appellant. As he went through the fire suppression staging area, he saw appellant sitting on the guardrail next to personnel from the California Department of Forestry and Fire Protection (CDF), looking around and taking pictures. At the time, Luikart assumed appellant must be a member of the press to be allowed there. By this time, the fire had burned down to the road in some places, although the main portion of the blaze was higher up the hill. The location where Luikart had initially seen appellant was completely engulfed.

United States Forest Service (USFS) Battalion Chief Cooper received information about the fire around 2:00 p.m. on August 13. He was the first firefighter to reach the scene; when he arrived, the blaze was between five and ten acres in size. It was approximately 75 to 100 feet from Highway 168 and 30 to 40 feet from the edge of the turnout. Because of the effect of the wind in what was a very sharp canyon, the head (most intense part) of the fire ran across the slope instead of straight up. The fire spotted out in front, i.e., embers caused smaller fires to start ahead of the main blaze. An hour and a half or two hours into the fire, it spotted across the drainage area and made a run toward Meadow Lakes, a small subdivision. The Beale fuel break allowed firefighters to prevent the fire from destroying any homes in that area.

CDF Fire Captain Ferguson was dispatched to the blaze around 2:00 p.m. When he arrived, the fire was approximately five acres in size and was taking off on the eastern side of Backbone Ridge where it intersects Highway 168. The fire had started someplace mid-slope or slightly below mid-slope and had burned to the top of the ridge. It struck Ferguson as an unusual fire in that its origin was not right next to a road or a place of human habitation. Vegetation in the area of origin consisted of grass with scattered, moderate brush. Ferguson saw no apparent explanation for the fire's start. Based on elimination of other causes and Ferguson's years of fighting fires in that type of topography, Ferguson concluded the fire was caused either by teenagers playing with fire who were able to flee the scene, or someone who deliberately set the fire and was able to flee the scene.

In the course of his career with CDF, Fire Captain Rusty Souza had investigated fire scenes to try to determine cause and area of origin approximately 800 times, and was the primary cause-and-origin investigator on 300-350 of those fires. He arrived at the scene of the Highway 168 fire on the morning of August 14. By eliminating possible causes, he determined there was no natural or man-made accidental explanation for the fire. Accordingly, he concluded the fire was intentionally set. Souza was unable to determine a point of origin, although he found more than one area of confusion where he believed separate fires had started.[4]   He could not determine whether these resulted from spot fires or from multiple fires being set. He did not find an ignition device. Then-CDF Battalion Chief Ron Subia told Souza that he had found an area of origin toward the base of the hill. Subia was unsure what started that particular fire. More than a week after the fire, Subia told Souza that he had gone back and found an ignition device.

In March 2001, Luikart was in Home Depot in Clovis when he saw appellant. Appellant's hair was still long and reddish-colored and he was wearing a black belt with red and orange flames all the way around it. It was then Luikart decided it was obvious appellant did not work for the Fresno Bee. Luikart and appellant made eye contact; the look appellant gave Luikart which was not friendly and seemed somewhat aggressive-made Luikart believe appellant was not all right mentally. Luikart then went to his vehicle and started driving around the parking lot, trying to find a truck that looked like the one he had seen the day of the fire. Luikart found two, one with and the other without a camper shell, then saw appellant get into the one with the camper shell. Luikart was able to get the license number and also wrote down a detailed description of everything he saw on the vehicle, including bumper stickers. He contacted CDF the next morning. Luikart subsequently identified appellant from a photographic lineup as the man he saw running down the hill and at the back of the truck. There was no doubt in his mind.

On Sunday, August 19, 2001, a fire broke out just off of Highway 180, between Dunlop and Sequoia Park. Michael Ellis was at the Sierra Inn, he estimated around 6:30 or 7:00 p.m., when someone came in and said there was a fire.[5]   Ellis went outside and saw a light whisk of smoke. He watched for 30 to 45 minutes, during which the fire appeared to be growing more intense. At some point-Ellis thought after he had been outside and then gone back inside-Ellis observed appellant enter the inn. He had a large, green drink cup with a purple top. He was dirty and sweaty and "kind of musty looking." He wanted some ice water and ice in his cup. He was acting kind of nervous and sweaty and fidgety. He left after a few minutes.

Dale Fleet happened on the scene of the fire before any firefighters. He pulled into the lower turnout and parked to watch the fire.[6] The only other people around were a family, James McCarthy (who was traveling with Fleet but in a

---

[4]  An area of confusion results when a fire starts and burns in several different directions because it is looking for fuel and it is wind-or topography-driven. Once it finds a steady wind or pattern of topography and/or a good source of fuel, it avails itself of that particular factor, which influences its path.

[5]  The inn was on Highway 180, a couple of miles below the fire.

[6]  There were two turnouts in the immediate vicinity. They were referred to as the upper and lower turnouts.

4

separate car, and appellant. Appellant appeared to be watching the fire, then he started to help direct traffic.

Later on, appellant appeared in the upper turnout, to which Fleet and McCarthy had moved. He was taking pictures, and he and Fleet and McCarthy began talking. Appellant said that photography was a hobby of his and that he had just purchased the long lens on his camera. Appellant then named two or three other fires he had seen, including the Panorama fire. He mentioned how many acres and structures were burned, and said he had lived in San Bernardino when that fire happened. With respect to the Highway 180 fire, appellant told Fleet that he had gone up to the park, but found out it cost $10 to get in. He did not want to pay the money, so he came back down, stopped at a restaurant to get some ice, saw the fire, and then went back up to the fire's location. Appellant was upset that he had to pay the park fee when he was only going to be in there for a couple of hours. McCarthy described appellant as being "a little angry in an agitated sort of way. Kind of like he was really mad at the Forest Service or the National Park Service, whoever is in charge of the Big Stump entrance up there."

Fleet suspected appellant might have started the fire due to the photography, appellant's knowledge of other fires, and the fact appellant should have gone by the location of origin close in time to when the fire started and yet said he saw the smoke only after he came out of the restaurant. As a result, Fleet spoke to the ranger who was directing traffic, then, at her request, waited until a fire investigator arrived. Fleet pointed appellant out to Rick Moore, the investigator.

CDF Firefighters Elite and Sugimoto were among the first engine crew to respond.[7] They arrived to find the fire about 100 feet from the edge of the highway and two to five acres in size. The terrain was mountainous and fairly steep; the fire was burning in steep brush, in a gully or drainage area. Neither Elite nor Sugimoto noticed appellant at the scene.

CDF Battalion Chief Marquez arrived just as the fire-fighting effort was being organized. The fire was between five and ten acres in size at the time, and a little over halfway up the hill in a draw. Marquez saw appellant when he arrived. Appellant was standing in a turnout. Later, appellant was very close to where Marquez was having a conversation and looking at a map with one of the division chiefs.

CDF Fire Captain Chrisman arrived after fire suppression crews were already on the scene. Within several minutes of his arrival, he saw appellant in the upper turnout, which had the best view of the fire. It appeared appellant had a camera and was taking pictures. He continued to do so for the several minutes Chrisman remained at that location.

CDF Fire Battalion Chief Moore arrived at the fire just before 7:30 p.m. He was assigned to conduct a preliminary fire investigation, which meant interviewing people at the scene and documenting anything of importance to the fire. As a result, Moore took statements from civilians at the scene, including

---

[7] Although both estimated they were notified of the fire around 5:00 or 5:30 p.m., log books showed they were dispatched at 6:35 p.m. and arrived at 6:50 p.m.

appellant.[8] Appellant pointed out a maroon GMC pickup with a tan camper as his. Appellant told Moore that he had gone up to check out Sequoia National Park that afternoon, but, being frustrated because it cost money to get in and he did not want to pay $10 when it was the end of the day, he turned around and came back down. He stated that as he came around the corner, he saw the fire. Appellant said he was going to try to get some photographs, and that he was assisting with traffic control.

As they continued their conversation, the subject returned to how appellant came to be there. Appellant deviated somewhat from his initial account, and said he had come around a corner and bypassed the area to go down to a store about a quarter of a mile below the fire scene to get some ice. When he came back outside, he saw the fire and went back up to assist with traffic control and take pictures. He stated numerous times that he had gotten there before anyone, even the fire trucks. At one point, appellant expressed curiosity as to who would do something like this, referring to the fire. Appellant said he liked to take photographs and thought he could get some good ones, and that he had the ability to sell them to the Fresno Bee. Appellant said the newspaper paid good money for a good photograph.[9]

During the conversation, Moore purposely positioned himself so that appellant's back was to the fire. Appellant constantly looked over his shoulder at the blaze. At one point, appellant suddenly began speaking about the fact that he was clean and sober and trying to get his life straight, and that he had been in a rehabilitation center in Santa Cruz.

Approximately 90 minutes after Metcalf arrived at the fire, appellant came over to the command post and started listening to fire officials discussing their plan for the fire. There were a few other civilians in the area, but none of them appeared to listen to the firefighters' conversation. Appellant remained for at least 20 minutes.

Chrisman remained on the scene until around 9:00 p.m. A couple of hours after he saw appellant in the upper turnout, Chrisman saw appellant sitting on a rock in the lower turnout, watching the fire. Nearby, one of the engines was having a minor electrical problem. Appellant offered his services as an electrician. Chrisman and appellant talked for a few minutes, then Chrisman said he was preparing to leave on a new assignment at a new fire. Appellant was very interested in the size and location of that fire. Chrisman pointed appellant out to Souza and others. He had previously been shown photographs of appellant by people in the fire prevention bureau.

On Monday, August 20, Irene Burlingame was at work in the Hume Lake Ranger Office when she noticed appellant looking around the office. His hair was pinkish or reddish and reminded her of Bozo the Clown. He appeared unkempt. He said something like, " 'Looks like you have a fire, where is it?" which was obvious. Burlingame believed he also asked when it started. Appellant said he had to get up to the area to do some checking for a realtor friend of his who was

---

[8] Moore had previously been advised that certain vehicles-among them, appellant's-had been located at or near other fires, and that appellant's name had come up in the investigation.

[9] According to the Fresno Bee's records, no photographs were ever sold to it by appellant.

considering selling or purchasing property. Burlingame explained there was no way anyone could get up in the area because of the fire, but he was very insistent. He said he was an electrical contractor and was going to check some underground lines. Burlingame, who knew the area, told him she did not believe there were any underground electrical lines up there. Appellant said he was a contractor and would be glad to work for the Forest Service. He said he was honest, did not do drugs, and was very dependable, unlike most electrical contractors. He remained in the office for about 10 or 15 minutes; as he was backing out the door, he sought to reassure her that he did not smoke, drink, or do drugs, and was very dependable.

Approximately eight or nine miles of Highway 180 were closed for five days. Around 9:30 or 10:00 p.m. on August 23, Caltrans Worker Hall was at the upper closure, sitting in his truck, when appellant approached and asked if he could drive in to the fire to take some pictures. Hall explained that was not allowed right then, but that there might be organized times when the main fire camp was allowing press and other folks in, and so appellant needed to go down to that camp and talk to people there. Hall had previously been advised by Forest Service personnel to watch for a maroon vehicle with a tan camper shell. Seeing that appellant had pulled up in such a truck, Hall attempted to get his name by saying he would pass it along. Appellant did not respond and said he knew where the fire camp was and would go that way. At some point, appellant mentioned that he was a free-lance photographer and electrician by trade, and that he lived in Fresno. When Hall commented that he should have been there when the fire started because some really good flames could be seen from the road, appellant said he had gotten pictures of that as well as of air tanker drops. Hall got the license number of the truck as appellant drove away, then notified his dispatcher. At the time, appellant had bright orange hair.

Captain Hinz, a USFS forest protection officer who had been a firefighter since 1966 and a fire investigator since 1978, was assigned to determine the cause and origin of the Highway 180 fire. Based on what he saw on the ground, the time of report, the time of initial attack, and burn indicators, Hinz estimated the origin time as 6:15 p.m.[10] He believed the fire could have burned for approximately 20 minutes before it was reported.

In the area of origin was a drop-off from Highway 180 into a gully or drainage area, then, toward the bottom of the fire, it sloped up to between 30 and 50 percent with a southwest aspect. The fuel types were brush and grass, with some trees. Hinz was able to locate an area of origin based on burn indicators, fire behavior, the weather, and the terrain. The fire initially ran parallel to the drainage, then continued on upslope. The area of origin was not in the ravine itself, but approximately six to ten feet away. It was 165 feet from the road. Hinz was able to narrow the area of origin to a circle five feet in diameter, although he had some reservations about it and could not determine a point of ignition because the scene had been so disturbed. Hinz eliminated all ignition sources with the exception of someone intentionally starting the fire, either by placing or throwing an ignited substance. It could have been either a hot set (flame to fuel) or delayed ignition device. The area of origin was the kind of spot someone would pick to start a fire if he or she really wanted to get it going, as the fire should have "ripped up" the slope. In this case, however, although eventually it became a large fire, it was a very slow burn due in large part to higher than usual fuel moisture.

[10] Burn indicators are used to determine a fire's direction of travel.

1   The Highway 180 fire ultimately burned approximately 4,300 acres,
2   including a cabin, other structures, and timber belonging to James Donovan; and
    structures and two travel trailers belonging to Darrell Knoy. One of the trailers
3   served as the Knoy family's weekend residence. Donovan and Knoy both suffered
    substantial economic loss. Firefighters battled the blaze for almost two weeks.

4   Sporadic surveillance of appellant was being conducted by May of 2001.
5   Souza was in charge; other agents involved were USFS Special Agents Launer
    and Matthews, USFS Criminal Investigator Hernandez, CDF Fire Captains
6   Hanon, Applegate, and Day, and CDF Fire Captain Specialist Weger.

7   On August 26, 2001, surveillance on appellant began at 7:00 a.m. at
    appellant's residence on South Winery, in the Church and Chestnut area. The
8   morning's surveillance took place mostly within the Fresno city limits. It then
    proceeded up Friant Road to Auberry Road. Appellant, who was driving an older,
9   maroon or copper GMC pickup with a camper shell, stopped at a drugstore in
    Prather. He purchased four rolls of film, which he placed in the back of the truck.

10  From there, appellant continued on Auberry Road through Auberry, then
11  turned left on Powerhouse Road toward North Fork. Prior to turning onto
    Powerhouse Road, appellant had been driving at normal speeds. After the turn,
12  however, he significantly decreased his speed. After starting the descent toward
    Kerckhoff Reservoir, appellant pulled over into a turnout and stopped.[11] There
13  was grass, scrub oak, and mixed brush there, and the topography was a moderately
    steep ravine with a culvert and small ditch at the bottom by the turnout.

14  Launer, who was with Matthews and who had been following appellant,
15  drove on past, then pulled into a nearby driveway. A few minutes later, appellant
    passed his location, heading toward the reservoir. Launer followed appellant
16  across the river and into Madera County, then pulled off the road next to the
    powerhouse. Meanwhile, Souza requested that someone go to the turnout where
17  appellant had been and check for a fire. Matthews, who knew which turnout
    appellant had used, radioed directions to Hernandez.

18  At 2:10 p.m., Hernandez saw the fire starting in a small drainage area on
19  the south side of the road. No one else was in the area. The fire was small and up
    the hill about 20 feet from the turnout in which appellant had stopped. The area
20  was grassy, with scattered brush. Due to the distance and wind direction, there
    was no possibility it had been started by embers from the nearby North Fork fire.
21  Hernandez immediately radioed to the surveillance team that he had a fire, then
    attempted to protect the point of origin from foot traffic. He also notified his
    dispatcher and requested that air support be diverted from the North Fork fire.

22
23  During the time Hernandez was locating the turnout appellant had used,
    Souza saw appellant turn off into a recreational area a quarter to half a mile
24  beyond the powerhouse. Approximately 30 seconds after Matthews's final contact
    with Hernandez, and just as Souza was parking near the recreational area,
25  Hernandez radioed that there was a fire. Souza and his team remained at their
    location approximately 10 minutes, during which time Souza observed a whisk of
26  smoke on the Fresno County side of the river, coming up through the tops of some

27
_____

    [11] Appellant had previously pulled over several times, apparently to let people pass. On one occasion,
28  however, no other vehicles were visible to the surveillance team.

8

trees.

When Matthews heard the announcement of a fire, she looked out over the reservoir in the direction of the turnout appellant had used and was just barely able to see a wisp of smoke cresting over the tree line. A couple of minutes later, she and Launer spied appellant on foot, walking along Powerhouse Road in their direction. Appellant, who had a camera, looked across the reservoir and took some photographs in the direction of the turnout. He took photographs from more than one position. His attention appeared to be completely focused on the subject of his photographs. Appellant then turned and walked back in the direction from which he had come. A minute or two later, appellant's vehicle passed Launer's location, heading back toward Fresno County and the location of the fire. By this time, the smoke was building.

When Souza learned that appellant was again leaving in his vehicle, he and other members of the surveillance team followed him back into Fresno County and, when he pulled over into a turnout that was fairly close to the fire, the decision was made to arrest him. Matthews and Weger stopped him, and Matthews made the formal arrest. Launer-who arrived after appellant had been taken into custody-looked inside appellant's vehicle. In the back of the unlocked camper shell were various personal items, tools, and, in a coffee can by the tailgate, two or three propane lighters. In the front seat was a box of Marlboro cigarettes and a camera.[12]

Ultimately, helicopters and firefighting crews were diverted to this fire from the North Fork fire that was burning several miles away. The Powerhouse fire burned just over three acres.

Following his arrest, appellant was advised of, and waived, his rights.[13] He immediately said he would not have started this fire. He related that he had been clean and sober for approximately 12 years 9 months, and had done nothing but try to live his life within the rules of society. He said that when he became sober, his problems went away. He admitted doing " 'a lot of stupid and crazy things' " when he was drinking and using drugs, but once he stopped, his life changed. Appellant said he had stopped smoking and been smoke free for many, many years. He admitted starting some fires when he was a youngster; he thought the first occurred when he was around 14. He said he started a roadside grass fire with a match. For the second fire, however, he used a time delay device made from a Marlboro 100 cigarette with matches. When Matthews asked how he learned to do that, he said he was taught by Danny Pruitt, another person who also started fires. Appellant said he was living in the San Bernardino area at the time. Appellant

_____

[12]   CDF Battalion Chief Smith, who responded to the scene from Fresno and so arrived at least half an hour after the arrest was made, looked through the windows of appellant's vehicle at the scene of the arrest. He was specifically looking for cigarettes, matches, or other ignition devices which might be visible. He did not see any cigarettes on the seat. He did not look in the back of the truck. Neither did Weger, who searched the cab for weapons. Weger, who also entered the cab to get a bottle of water for appellant, saw nothing in the cab that he would associate with being able to [fn. contd.] ignite a fire. Looking through the back window, however, he was able to see a barbecue lighter sticking out of a coffee can.

[13]   Appellant was interviewed at the turnout, then transported to the Auberry substation to continue the interview.

9

described the device to Matthews and explained how it worked. He admitted making such a device when he was a youngster and leaving it in wildland grass. Appellant said he placed the device in a field and had time to leave the area-approximately five minutes-before the fire started. Appellant said his reaction had been that using the device was a lot "sneakier" than just throwing a match, and he admitted lighting two to three fires in the field. Appellant told Matthews that if a Marlboro 100 with a filter was used, it left remains that investigators might find, and that for the field fires, he used filters. He said that Danny Pruitt lit a fire in a ravine and also near appellant's home. Appellant said he had been blamed for that fire. Appellant gave the impression that he was young when he saw his first big fire. He said his parents had taken him up to the San Bernardino mountains when there was a big fire, and that it impressed him and always stuck out in his mind. He related that he had heard people talking about it, and that their reaction was fear and respect.

Appellant told Matthews about three fires he started as an adult. The first was when he was living in a Christian community in Santa Cruz. He related that he had gotten very drunk and set a pile of furniture and trash on fire. He was angry at another resident at the community and those who ran the place. He related that he started another fire in Santa Cruz as an adult, using a cigarette lighter. He did it because he was mad at someone who, he had found out, was an informant for local narcotics officers. He lit a pile of trash in this person's garage on fire. Matthews was not sure of the location of the third fire, but believed it was in the general area of Santa Cruz. Appellant said it was a small fire started at a roadside. He said he was walking down the street and did not want to get into the car with some of his drinking friends, so he flipped a cigarette. That fire occurred in 1987; as far as Matthews could recall, it was the most recent fire in time for which appellant said he was responsible. At one point, appellant said that the fires he started before all had one thing in common: he took a book of matches and put a cigarette behind the heads of the matches as a delay, and " 'that was the M-O so to speak.'"

Appellant gave many reasons for starting fires, but in general used fire to strike back at people who treated him badly. Appellant said drugs and alcohol affected why he started the fires. Although appellant gave various reasons for turning his life around, one was that in 1988, he went to a detoxification center. He told Matthews about a lot of psychological strains, and said that within the past year, he had been in an auto accident near the Fresno area in which he had hit another vehicle. He said it really scared him, and so he would drive very slowly at certain times in certain areas. Appellant said he did electrical work, and related that he had done a lot in terms of fire prevention and letting the people for whom he worked know how to prevent fires.

Appellant said he was in the mountains on the day of his arrest because he wanted to go to Kerckhoff Reservoir and take pictures. He also said he wanted to go to the North Fork fire. Although he said many things about the fire on Powerhouse Road, the predominant theme was that he did not start it. Appellant said he had stopped to buy film, but then did not end up going to the North Fork fire because it was getting late. He had an appointment early the next morning and had to get back in time to get some rest. Appellant gave the first name of the person with whom he had the appointment, but could not remember the last name or the exact address. When Souza tried to get him to describe the appointment's location, he had difficulty doing so beyond that it was in Fresno. Appellant also said he changed his mind about going to the North Fork fire because he had some business-related telephone calls he needed to make concerning a job interview.

Appellant admitted pulling over where the fire started, but said he would not have done anything to hurt his possibilities for the next day. Toward the end of the interview, appellant stated, " 'I'm just trying to make a point. I mean, look, I have been honest with you guys. I mean, if I had anything to hide, then, you know, I would make you dig.'"

When Souza asked appellant about the Highway 180 fire, appellant said he had seen it in the beginning stages. He related that he was going to Sequoia National Park to go hiking, but when he got there, he learned it cost $10 and so he turned around. He did not feel the admission fee was right because he did not plan on being there very long, and in fact asked park officials whether there could be a reduced rate. He said it did not upset him to drive all the way up there and find he had to pay $10. On his way back down, he stopped at a bar with a restaurant. He had his cup and wanted some ice. He said that he continued down the road to a store further down because he wanted to get some water, and as he was walking out of the store, he saw smoke. He then drove back to the fire to see what was going on. He said he took pictures of the fire suppression activity, the aerial drops, and the fire in progress. At one point in the interview, appellant said he went to the Highway 180 fire that one time. At another point, however, he said he drove back at night a few nights before his arrest, but not all the way to the fire, to take pictures of the moonrise. He denied driving near the Forest Service office or going close to the fire zone.

At some point during the interview, appellant said he was taking pictures of fires because he knew a lady named Mary Johnston in Waco, Texas (where appellant previously lived), and he was trying to collect pictures from fires to send to her so she could use them in fire prevention-type activities in Texas. He said Johnston was an elementary school teacher, but she taught hundreds of children at certain times of the year. He did not have an address for her, but said he knew someone who might be able to find her so that he could send her the pictures.

Appellant was asked about the Highway 168 fire. He said he had been up Highway 168 to Mono Wind, but had never been on the Four-Lane. He said he only knew the park-and-ride by the Auberry turnoff, but had never been up any farther. Appellant said he saw a fire about a year before, and that he thought it was around Highway 180. According to Matthews, however, he was referring to the Highway 168 fire. Appellant said he had driven up a multi-lane road and seen a fire burning. There were numerous emergency personnel, and he pulled over, took pictures, and talked to a few people. With respect to why he had denied being familiar with any fire on Highway 168 beyond the park-and-ride, appellant said he did not keep a log of his movements, and that he remembered seeing a fire but never knew the name of the area. He said that if Souza, who was asking the questions, had said something about Auberry, it would have rung more of a bell.

During the interview, Souza asked appellant if there were any cigarette lighters in his truck. Appellant said there were, as he kept some in the bed of his pickup for use in his profession. Appellant explained that as an electrician, he needed to have matches and cigarette lighters to perform heat-wrapping to repair damaged wires or to seal connections.[14] Souza then asked if there were any

---

[14] Souza, who had performed a similar function with wire that was probably comparable to what electricians would use, did not believe a match would produce sufficient heat. A lighter might, but would begin to get hot once it had been held for a certain amount of time.

cigarettes in his truck. Appellant said yes, that a customer with whom he was working on a business deal left them in his vehicle a month earlier. Appellant said the person's name was John, but that he did not obtain the last name. Appellant said he had gone to John's house in the Shields and Hughes area. He said it was necessary to turn down several side streets in that general area to get to John's house, but appellant could not recall offhand exactly how to get there. Appellant said he did not keep the address.[15] Appellant said he gave John a ride, then noticed a pack of cigarettes lying on the seat of his pickup. Appellant put them in his briefcase, having been a nonsmoker for more than 11 years. When asked why he was keeping the cigarettes, appellant first responded, " 'Huh?' " When the question was repeated, he said he might know someone someday who was a smoker and who might want the cigarettes, in which case appellant would give them to that person. Appellant said he had pretty much forgotten the cigarettes were in his briefcase.

At some point during the interview, Matthews was talking about how fires could start quickly or could be delayed. Appellant said he had already told them the one and only way he ever knew to delay the start of a fire, and that if someone were to find a device like that-which he had been told would leave remains-then " 'shame on" appellant. Unless someone found something at the scene that tied back to his past, however, it was merely a " 'bad coincidence' " that he was in the area, but that did not make him guilty of starting a fire. When the subject came up about having a deputy transport appellant, appellant protested that there was not one person who could say he was appellant do it.

On the evening of August 26, a search warrant was executed at appellant's place of abode. A loaded shotgun was found in his room, as were numerous photographs of different fires in various stages of burning. Some were in a packet labeled " 'Fire, Auberry, 2000.'" Also found were matchbooks, "aim and flame-type" lighters (i.e., long, wand-type lighters), and newspaper articles depicting firefighters.

On August 27, Hanon, Weger, and CDF Investigator Vaughn searched appellant's vehicle, which had been secured at a garage in Auberry. A camera loaded with film was found in the front.[16] In the back compartment were tools, a camera bag inside which was a roll of exposed film, a bag from the drugstore in Prather with a receipt dated August 26, and a four-pack of film. Also in the back, in a coffee can in which appellant kept nails, were an "aim and flame-type" lighter and a Bic-type lighter. In an inside pocket of a small leather bag in the back were

---

[15] Appellant explained to Souza that he talked to a lot of people who were potential customers because he was an electrician. Initially, he would take their name and telephone numbers and arrange to meet with them where they want him to do the work if they decide to hire him. He would give them an estimate; if he was not hired, he would just throw away the name and address.

[16] The exposure number indicator led Weger to believe a number of photographs had been taken. The film was subsequently developed; there were several pictures of a fire, as well as pictures of Kerckhoff Reservoir and one of the powerhouse. By matching terrain, Vaughn was able to establish some of the photographs as having been taken from the location at which Matthews had seen appellant taking pictures on August 26. The fire photographs were established, again by matching terrain, as depicting the Highway 180 fire. The photographs were taken at the roadway edge, closest to the burn. Also by matching terrain, authorities determined that photographs of the Highway 168 fire were among those seized from appellant's room.

a package of stale Marlboro cigarettes and two books of matches.[17]

After the vehicle search, the investigators returned to the turnout. There, Weger found a Marlboro cigarette butt, which he did not see on August 26. Although it appeared to have been twisted off and not smoked, appellant was excluded as the donor of the small amount of DNA recovered from it.

Meanwhile, fire investigators were on the scene. Hinz arrived as fire suppression crews were finishing up. An area near the road had been cordoned off. Hinz interviewed Hernandez, but did not enter the cordoned-off area because the area was in shadows and Hinz needed good daylight.

Day spent the night to prevent entry into the cordoned-off area, then Hinz returned the next morning. He looked the area over for burn patterns and forward movement of the fire, as forward movement can be followed back to the origin. In determining the area of origin, Hinz took into account burn patterns, vegetation types, topography, and the weather. He and his team, which consisted of Day and United States National Park Service Ranger Gebicke, were able to determine that the fire came from somewhere inside a 10-foot-square area within 10 feet from the edge of the turnout. By following the burn indicators, they were able to identify a four-foot-square area that showed a high rate of incineration. Such complete consumption made it difficult to find the actual ignition source. If the ignition source was a device made of matches and a cigarette, there was a high probability it was consumed. In addition, a branch fell across the area, adding to the disruption of the ash bed. Even so, Hinz and his team found some ash that was more like paper, and possibly even a tiny staple such as would be found in a matchbook. Although there was too much consumption to tell for sure, the ash appeared foreign to the surrounding ashes.[18]

As a result of his investigation, together with his training and experience, Hinz was able to eliminate all causes other than an intentionally-started fire.[19] Intentionally-started fires are either hot set (i.e., started immediately) or set through use of a delayed ignition device. Although this fire could have been either a hot set fire or one set using a delay device, based on what Hinz saw on the ground, the rate of spread, the time frames, and the last time anyone was seen in

---

[17] Hanon, who searched the front of the vehicle, did not find any cigarettes inside the cab. Weger handled the Marlboros found in the leather bag with his bare hands, possibly destroying any fingerprints.

[18] Ultimately, this ash could not be identified as coming from any particular source such as a cigarette. Weger, who vacuumed the area of origin in order to sift through the material, found what looked like a small piece of carbon. He believed it to be a paper match head, although a confirmatory microscopic examination was not performed. In Weger's experience, a cigarette-matchbook device was a common means of ignition-indeed, the most common time delay ignition device, although the most common device used in arson-caused forest fires was a cigarette lighter. Weger had been a fire investigator since 1986, and had seen the remains of delayed ignition devices in wildland fires. In some, he found a line of ash, as from a cigarette. In others, he located fragmented or disturbed pieces of ash that appeared to be the remains of an ignition device. In still other cases, the suspect's statement led him to believe an ignition device was used, although he could not find any sign of it in the field.

[19] Gebicke, who had been a certified wildland fire investigator for approximately 10 years, concurred with Hinz's conclusion that this was a human-caused fire.

13

1    the area, he believed some sort of delay device, that was tied or put together in
2    some fashion, was used. He acknowledged, however, that it would be extremely
     difficult to prove, given the amount of incineration. All he could say with
3    certainty, having eliminated all other possible causes, was that the fire was set
     either by a time device or was hot set.

4        The area of origin was near the turnout used by appellant, a short distance
     from the road, in the small drainage ditch. Because of air movement up the
5    drainage area and the fact fire burns uphill faster than downhill, the drainage area
     made the side of the road on which the fire was started-the uphill side-a better
6    place than the other side of the road at which to start a fire that would travel.

7        On August 28, Souza and Weger interviewed appellant again. This time,
     appellant said he happened to be on the Four Lane in August of 2000 because he
8    was going to Shaver Lake. He said he had been involved in an accident earlier that
     day, and that he was upset and decided to go up to the lake. However, his car
9    began making an unfamiliar noise and so he decided to turn around and go home
     because he was concerned there was a mechanical problem. Appellant said he was
10   driving up the Four Lane when this occurred. Appellant had originally said he
     went straight to Mono Wind Casino and, after a short time, came out and saw
11   smoke. When Souza reasked him, however, and said there was a witness who
     could place him at the scene of the fire, appellant thought about it, then stated he
12   had pulled into the turnout that Souza had related was the general area of origin,
     and had gone into the brush and urinated and then got back into his truck and
13   continued on to the casino. Appellant said there was no fire at that time. Once he
     saw the smoke, he decided to drive back to the fire to take some photographs.
14

DEFENSE EVIDENCE
15

16       Jeff Hanlon reported a fire on Highway 168 shortly after 3:00 p.m. on
     August 13, 2000. The fire was not too big at the time-perhaps the size of a small
17   car and as high as a nearby tree-and was approximately 30 feet from a turnout.
     Hanlon saw a tall, lanky man in jeans up on the hill. He appeared to be doing
18   something with the fire. There was an older gray truck parked in the area with a
     man standing next to it. No fire equipment was present yet, nor were any cars
19   starting to stop on the highway to watch the fire. Both men had dark hair.

20       Warner Dozier, who had spent a summer as a firefighter for the Forest
     Service, observed the Highway 168 fire from a large turnout near the Beale Fire
21   Road. He reached that location just before the first air tanker arrived. Shortly after,
     he heard what sounded like a couple of firecrackers off in the distance, down and
22   to his right. Shortly after that, he saw two or three columns of smoke rising off the
     edge of the road, one-quarter to three-eighths of a mile from the main fire and 20
23   to 25 feet apart. An air tanker extinguished that portion of the fire. Given their
     location vis-a-vis the main fire and the direction of the wind, Dozier did not
24   believe the new fires started because of the main fire. The three columns of smoke
     all rose within 10 to 15 seconds of each other; Dozier did not see anything that
25   would account for them starting by natural causes. Instead, it appeared they were
     started on purpose.[20]

26

27   _____
        [20] According to CDF Division Chief Hicks, who was responsible for coordinating the air and ground
28   attacks, a fire retardant drop struck a power pole containing three transformers. The transformers shorted out and
     there were three loud pops due to arcing and automatic attempts to reset the power. Hicks did not send any air tanker
     or helicopter to suppress any signs of fire that were not directly connected to the main fire, although retardant drops

Alvino Terronez, Jr., had known appellant for years. At times, including that of his arrest, appellant resided with the Terronez family. To Terronez's knowledge, appellant's hobby was photography, and appellant took pictures of a number of subjects. Appellant also enjoyed barbecuing. There was a large barbecue in the Terronezes' backyard.

Then-CDF Battalion Chief Subia testified at the preliminary hearing that he was the primary cause-and-origin investigator for the Highway 168 fire.[21] Utilizing burn indicators, he determined that the fire started in some trees near a turnout and then moved uphill. After eliminating all natural causes, he formed the opinion that the fire was deliberately set. He found a match-and-cigarette ignition device within the area of origin, and determined it was the cause of the fire. The device was at the base of a drainage slope, which is a good place to start a fire for rapid acceleration. The device was approximately 50 to 75 feet uphill from the turnout area.

At CDF's request, Officers Dust and Koenig of the California Highway Patrol's internal affairs section subsequently conducted an internal investigation of Subia's conduct with respect to the Highway 168 fire, including whether he himself manufactured the ignition device he claimed to have found.[22] Although Subia claimed to have found the device on or about August 15, he dated the evidence tag August 13 and testified, at the preliminary hearing, that he found the item August 14. Photographs of the device on the ground were dated, by the camera, August 16 and 17. There were also inconsistencies in Subia's statements, and there were no negatives for the photographs Subia took of the device or records of how those photographs were taken. There were issues concerning Subia's claimed education and experience, as well as his evidence collection procedures and documentation. On his CV, Subia represented that he had Associate of Arts degrees in fire technology and criminology from College of the Sequoias, and a Bachelor of Science degree from Fresno State University. In reality, he possessed neither degree and there was no evidence he ever attended Fresno State. Although Subia explained those were his educational goals, Dust concluded there was an attempt to deceive.

With respect to maintenance of evidence logs, the investigation was limited to the Highway 168 fire and concluded that proper procedures were not followed. There was also some question as to whether the ignition device was properly collected. In addition, Dust questioned Subia about his production of the preliminary fire report for the Highway 168 fire. At two points in the interview, Subia gave different answers concerning when he wrote the report. Although Subia said his handwritten notes were contained in the case file, Dust was unable to find any notes or other documentation to show that Subia wrote the Highway

---

were made when the fire spotted across Beale Fire Road and across Auberry Road. A hand crew picked up a hot spot in the area where Dozier saw smoke.

[21]  Subia's preliminary hearing testimony was read to the jury.

[22]  The investigation was initiated by the prosecutor, Regina Leary, apparently after her investigator discovered Subia had been dishonest in listing, on his curriculum vitae (CV), that he possessed particular education and training and that, in fact, he probably was not qualified to testify as an expert witness concerning arson investigation. The report of the preliminary investigation was turned over to CDF.

168 preliminary fire report prior to the Powerhouse fire.

Dust concluded Subia's evidence and documentary procedures were poor, and that Subia did a very poor job of investigating the Highway 168 fire. Dust did not, however, form the opinion that Subia fabricated the ignition device or that he lied about finding it on August 15. Given Subia's documentation problems, it did not surprise Dust that Subia placed the date of the fire, instead of the date of discovery, on the evidence tag or that the date may have been set wrong on the camera. The records were so poorly kept that Dust could not tell whether Subia was lying or simply kept no records concerning the device.

Koenig formed the opinion that Subia was being dishonest during the interrogation. However, he could not say whether Subia was being dishonest about his claim that he found the ignition device. The investigation revealed more evidence that he actually found it than that he did not find it. Koenig believed Subia had a motive for lying about the circumstances surrounding his finding of the device, the motive being that he was a very poor investigator and failed to document any portion of his investigation or the chain of custody for the evidence. About some issues, however, Koenig believed Subia had been negligent, as opposed to untruthful, in the routine completion of his investigative duties. Aside from the ignition device, Koenig found no other piece of evidence during the course of the investigation which he suspected had been tampered with.

As a result of the investigation, Subia was terminated from his position with CDF. Because Subia's CV was apparently false and questions were raised with regard to the device allegedly discovered at the Highway 168 fire, there was a general reconsideration of the case by the district attorney's office to determine whether the integrity of other evidence in the case had been compromised. As a result, the prosecutor's investigator made a number of new inquiries, but was unable to find any other evidence that appeared to have been compromised by Subia. It was possible other evidence was tainted; Subia was the chief investigating officer on all three of the fires until he was removed in late February or early March 2002. As such, he was the person in possession of the physical evidence, so the opportunity existed for him to compromise that evidence. The district attorney's office did its best to discover any taint and disclose it. The district attorney's investigator found Subia to be a liar or of doubtful credibility with regard to his CV and the ignition device he claimed to have found at the Highway 168 fire. The investigator found no other tainted items of evidence.

Appellant testified in his own behalf that he was a self-employed electrical contractor. He had lived in Fresno since October 1998; prior to that, he lived in Waco, Texas, from 1993 to 1998.

It was appellant's custom to photograph his jobs from start to finish, both to document his work in case of later question, and also to serve as a photographic résumé. When he was contacted by a potential customer, he would take down the name, telephone number, and address, then go to that person's location and give an estimate. If he did not get the job, he would discard the information. When appellant gave his statement following his arrest, he could not recall the name of the person with whom he was supposed to meet because the information was in his work folder, which was not then at his disposal.

16

1

Appellant testified that photography was a long-standing hobby of his, dating back to his teen years.[23] He especially liked to take pictures of theme parks, nature, and people. He had over 1,000 photographs in his collection.

2

3

Appellant enjoyed going to casinos. At one point, he went to Mono Wind every weekend to play bingo, but stopped going so often when bingo was eliminated. The year before his arrest, he went to Mono Wind no less than 35 times.

4

5

6

At the time of his arrest, appellant was renting a room from Richard Terronez's parents off of Chestnut and south of Butler Avenue in Fresno. To get to Mono Wind, he would drive out Friant past Table Mountain, or sometimes he would go by way of Willow to Copper and then Highway 168. He would stay on the highway until the Auberry turnoff, then turn left on Auberry Road. He would go through the town of Auberry and then follow the signs to Mono Wind. As of his arrest, he had never been to Shaver Lake, although he had wanted to go. In fact, he was headed there on the day of the Highway 168 fire when he noticed a noise starting to develop in his truck. He had been involved in a minor accident in late May of that year and was unable to determine the source of the noise. He turned around and started back; coming downhill, it seemed like the noise got worse, so he pulled over again. There was no fire near the Four Lane then; appellant denied starting any such fire. When he pulled over, he also had to relieve himself, so he went out in the field by a guardrail and went behind some bushes. He slipped on the way back down to his truck; when he got there, he looked around in the back of the vehicle to see whether something had spilled and might be making the noise. He took a water bottle out of his ice chest, then got back into his truck and drove off. When he got back to the Auberry turnoff, he pulled over and discovered something was loose underneath his truck. He fixed it, then turned around and drove toward Auberry, intending at that point to go to Mono Wind. As he was pulling out, he saw smoke, so he turned back around and drove back down to see what was happening.

7

8

9

10

11

12

13

14

15

16

17

On the day of the Highway 180 fire, appellant went to Sequoia National Park, reaching the gates around 5:30 or 5:40 p.m. There was an entrance fee; appellant asked whether he still had to pay it when he was only going in for about an hour to take some pictures and possibly hike. When he was told he would have to pay, he decided to come back another time when he would get his money's worth from the fee. Although unhappy about this, he was not angry. On his way back to Fresno, he stopped at a small restaurant and bar combination to get ice for a bottle of water he had in his truck. A lady working there gave him ice, then directed him to a store about a mile down the road where he could purchase a bottle of water. Appellant went to the store and made his purchase; as he was returning to his truck, he saw smoke, so he turned around and drove back in that direction to see what was going on. Appellant received permission from Rick Moore to watch the fire crews and take photographs as long as he followed their directions and left if they told him to. As a result, appellant stayed at the scene until approximately 10:30 that night. He tried to return to the scene of the fire on two subsequent occasions because he had heard it had grown. He wanted to get some photographs of it in that particular stage for a project he had been planning for some time, but was not allowed in. Appellant denied starting the Highway 180 fire.

18

19

20

21

22

23

24

25

26

27

28

[23] As of the time of trial, appellant was 51 years old.

17

On the day of the Powerhouse fire, appellant was originally going to drive out to North Fork and try to photograph the fire there. He had been in the area the second night of the fire and had intended to take night photographs, but realized when he got there that he had forgotten his camera. On his way, he had seen the powerhouse and a little bit of the lake and had decided to take photographs of those locations. That is what he was doing on the day of the Powerhouse fire, which he denied setting. He did not realize he was being followed; he pulled over twice to let traffic pass. He was driving slowly on the road because it is very curvy and he had had two accidents within a year of each other and so had developed slower driving habits, especially on mountainous roads.

Watching fires is one of appellant's many interests, although he would not call it an infatuation. He had plans to take a lot of fire photographs and make a collage, add fire prevention slogans, and try to market them to different fire-fighting agencies. Appellant had also had "[p]assing thoughts" of selling individual photographs, but never followed up.

Appellant admitted starting a few small fires as a juvenile. One involved a cigarette-and-matchbook ignition device. The remains of the device were found, and appellant never used such an ignition device afterward.[24] For the other fires he set as a juvenile, he used either a match or a cigarette lighter. The fires were all set in flat fields. On each occasion, appellant was high on drugs, drunk, or a combination. He started experimenting with drugs when he was six years old. He was 14 when he had his first drink. He tried numerous drugs, including psychedelics. By age 17, he was using drugs and alcohol all the time, and had also moved into intravenous methamphetamine use. He was "pretty miserable" as a youngster and used alcohol and drugs to escape. He had gender imbalance issues which affected him from the time he was four years old. Usually when he went out and did something bad, somebody had done something bad to him. He would start getting "really wasted," then, with his inhibitions lowered, would start a fire mainly to express his anger and frustration. He never started a fire when he was not under the influence of drugs or alcohol.

The last fire appellant started occurred when he was in his thirties, and was not purposefully set but rather an act of carelessness. He was very drunk and trying to hitchhike, as he had refused to ride with an intoxicated companion. He came to a house and wanted to use the telephone, but no one answered his knock. He was still a smoker then; he lit himself a cigarette with a match and threw the match. A pile of trash in front of the house caught on fire. Appellant did not even realize anything had happened until his arrest. None of the fires he set as an adult involved anything other than piles of trash.

On December 3, 1988, appellant checked himself into a detoxification and rehabilitation center in Santa Cruz. He never again used drugs or alcohol. Becoming clean and sober allowed him to learn ways effectively to channel frustration and anger without needing to act destructively. He became involved in Alcoholics Anonymous and, with respect to his gender issues, had been involved with a licensed psychologist in Los Angeles for four years. On the day of the Highway 180 fire, appellant was dressed in work clothes. He admitted, however,

[24] When he told Souza, during the interview, that all of his fires had one thing in common, namely the type of delay device, he was really scared and simply generalized. According to appellant, there is no record that says he used a device on any of the other fires.

that his appearance at the time of the Highway 168 fire was unusual; his clothing and appearance that day reflected his gender issues. Appellant had a sense of pride in his sobriety; starting one of the fires would have jeopardized that sobriety. He would not do that in his present state of sobriety.

As an electrician, appellant had to perform procedures which required him to possess sources of heat. One was to heat shrink. Although large forms required use of a propane torch or heat gun, house wiring was a lot smaller and so the heat shrink was so small it could be done with two or three matches held together and lit all at once, or a cigarette lighter. Because appellant worked on a lot of older homes, it was common for him to carry heat shrink, cigarette lighters, and matches.

Appellant denied having a pack of Marlboro cigarettes in a black leather pouch in the camper shell of his vehicle at the time of his arrest. He did not know how those cigarettes got into that pouch. There was a pack of generic cigarettes in the back section of his briefcase, which was behind the seat of his truck. They had been left on his seat by a potential customer earlier that month.

According to appellant, he was completely honest in the interview. He did not tell the authorities about returning twice to the Highway 180 fire, because by then Subia and Souza were threatening to charge him with other fires if he did not admit to starting the Powerhouse fire, and he was beginning to try to protect himself. He was scared and traumatized during the entire interview, and things were said to him when the tape recorder was off.[25] He was telling the truth and doing the best he could, given his mental state. When he realized they were going to take him to jail no matter what, he began to "clam up" on them.

Appellant told the authorities he was going to send pictures of fires to Mary Johnston in Texas, so that she had materials for her fire prevention program. Johnston was someone appellant met casually at Waco Elementary School when he lived in Waco and took his friends' children to school. He failed to tell the authorities that he had sent pictures to his friend's house in Waco in the hopes the friend could get them to Johnston.[26]

The parties stipulated that appellant had previously been convicted of a felony.

## DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody

---

[25] According to Matthews, who was present during the interview, the only time appellant said he was afraid concerned his gender issues in going to jail.

[26] Mary Coleman, previously Mary Johnston, testified that she lived in Waco from July 1995 to July 1999. She was not an elementary school teacher in Waco; instead, she taught high school and some middle school. She had no recollection of knowing appellant, nor did she ever teach fire prevention during the years she was in Waco. No one sent her photographs of fires, and she did not know of any other teacher in Waco named Mary Johnston.

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

out of the Fresno County Superior Court, which is located within the jurisdiction of this Court.

28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

(1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-

Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that

contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown

v. Payton, 544 U.S. 133,  141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06

(2000).  A state court decision will involve an "unreasonable application of" federal law only if it

is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti,

537 U.S. 19, 24-25 (2002) (*per curiam*).  "A federal habeas court may not issue the writ simply

because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly." <u>Lockyer</u>, at 1175 (citations

omitted).  "Rather, that application must be objectively unreasonable." <u>Id.</u> (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing

evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

and based on a factual determination will not be overturned on factual grounds unless objectively

unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254

apply to findings of historical or pure fact, not mixed questions of fact and law.  <u>See</u> <u>Lambert v.</u>

<u>Blodgett</u>, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501

U.S. 979, 803 (1991).  However, where the state court decided an issue on the merits but

provided no reasoned decision, courts conduct "an independent review of the record . . . to

determine whether the state court [was objectively unreasonable] in its application of controlling

federal law." <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000).  "[A]lthough we

independently review the record, we still defer to the state court's ultimate decisions." <u>Pirtle v.</u>

<u>Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.    <u>Ineffective Assistance of Counsel Claims</u>

Petitioner raises a multitude of ineffective assistance of trial counsel claims including

several subclaims.  In the habeas corpus petition filed in the California Superior Court, Petitioner

raised several claims of ineffective assistance of counsel, and argued he was entitled to a new

trial.  In denying the petition, the California Superior Court cited Petitioner's lack of "existing

evidence" to demonstrate "prejudicial ineffective assistance of counsel."  (California Superior

Court Habeas Order.)

Then, in the habeas petition filed in the California Court of Appeal, Petitioner raised the

same claims regarding the denial of effective assistance of counsel, which was denied without

1    comment by that court.  (California Court of Appeal Habeas Petition at (3)-305); California

2    Court of Appeal Habeas Order.)

3         Lastly, in the petition filed in the California Supreme Court, Petitioner re-fashioned his

4    claims as a "master" claim of ineffective assistance, incorporating numerous following

5    subclaims.  Petitioner presented several factual assertions which were virtually unfounded and

6    lacked any personal knowledge on his part, or otherwise competent evidence to support a finding

7    it was true.  (California Supreme Court Habeas Petition at "1 of 478" to "363 of 478".)  The

8    California Supreme Court denied the petition without comment. (California Supreme Court

9    Habeas Order.)

10         In the instant federal petition, Petitioner has presented what appears to be a photocopy of

11    the "master" and subclaims of ineffective assistance of counsel filed in the California Supreme

12    Court, with the addition of separate pages.  (Petition at "1 of 478" to "363 of 478".)  Each claim

13    will be addressed in turn, as raised in the state habeas petition presented to the California

14    Supreme Court.

15         1.    Ground One - Cumulative Error

16         In Ground One of the petition, Petitioner contends that counsels errors, addressed below

17    in Grounds Two through Fifteen, all cumulatively and independently amounted to ineffective

18    assistance, thereby depriving him of his Sixth Amendment right to competent counsel.  This

19    claim can be resolved easily by turning to the second prong of Strickland, because Petitioner has

20    not and cannot demonstrate any resulting prejudice.  Strickland, 466 U.S. at 697 ("If it is easier to

21    dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we

22    expect will often be so, that course should be followed.").  As explained in detail below,

23    Petitioner's claims essentially amount to nothing more than nitpicking counsel's every move

24    with the benefit of hindsight vision.

25         A defendant may prove that he has suffered ineffective assistance of counsel based on the

26    cumulative effect of errors.  See Wade v. Calderon, 29 F.3d 1312, 1319 (9th Cir. 1994), *cert.*

27    *denied*, 513 U.S. 1120, 115 S.Ct. 923 (1995); see also Cooper v. Fitzharris, 586 F.2d 1325, 1333

28    (9th Cir.1978) (concluding cumulative effect of alleged errors may demonstrate prejudice), *cert.*

1   *denied*, 440 U.S. 974, 99 S.Ct. 1542 (1979).  However, as discussed below, Petitioner has failed

2   to establish that his counsel's performance was deficient or that he suffered prejudice as a result

3   of the alleged deficiencies.  Petitioner cannot show the cumulative effect of the alleged errors as

4   the Court finds no errors to accumulate.  See Villafuerte v. Stewart, 111 F.3d 616, 632, (9th  Cir.

5   1997) (*per curiam*).   Accordingly, the Court finds no denial of due process.

6          As described above, Petitioner was charged and convicted of committing three arsons on

7   three separate occasions.  There was sufficient evidence in support of each of the three

8   convictions.  First, in regard to the Powerhouse Fire, Robert Hernandez testified that on August

9   26, 2001, while Petitioner was under surveillance, he after Petitioner was observed leaving a

10  turnout, he proceeded down the road in the same direction looking for a fire.  After traveling

11  approximately one-half mile, Hernandez observed a small fire beginning to burn in the same

12  turnout area up a hill about twenty feet from the road.  (RT 1745.)  At that point the fire was not

13  very big about ten feet by ten feet.  (Id.)  Hernandez immediately radioed to the surveillance team

14  that a fire had been started.  (Id.)  Given Hernandez's credible evidence, even considered alone, it

15  simply cannot said that the state court's rejection of this claim was contrary to or an unreasonable

16  application of Strickland.

17         Next, with regard to the Highway 180 fire, the evidence established that on August 19,

18  the day the fire was started by arson, Petitioner was on the scene at the beginning stages and was

19  directing traffic at the scene.  He also expressed curiosity as to who would start such a fire.  The

20  next day, Petitioner feigned knowledge of the fire by going to the ranger's office and asking

21  employee Irene Burlingame, "something like, 'Looks like you have a fire, where is it?'" Given

22  Petitioner's presence at the scene of the fire and subsequent lack of knowledge thereof, it is

23  certainly reasonable to conclude that rational jurors would find Petitioner's alleged ignorance to

24  reflect a guilty knowledge of the Highway 180 fire.

25         Given the overwhelming and strong evidence of Petitioner's connection to both the

26  Powerhouse and Highway 180 fires, the California Supreme Court could reasonably conclude

27  that Petitioner would have been convicted, notwithstanding any alleged errors by trial counsel.

28         Lastly, in addition to the strong evidence of Petitioner's guilt as to the preceding two

1   fires, there was overwhelming evidence of Petitioner's guilt as to the Highway 168 fire, which

2   like the other two fires, occurred on a Sunday as well.  Kurt Luikart, witnessed Petitioner at the

3   scene of the fire prior to its occurrence.  Although it is arguable that Luikart was motivated to

4   identify Petitioner to obtain the reward money, it was not objectively unreasonable to conclude to

5   the contrary, given all the evidence of Petitioner's guilt presented at trial.  (*Cf.* SP at 217-218.)

6   To find otherwise, would have required all of the jurors to accept the coincidence that the person

7   Luikart identified falsely was the same arsonist linked to other fires, based on independent

8   evidence developed after such identification.  Petitioner testified to his prior history of arson

9   which only added an additional basis for the juror's finding of guilt.  In sum, the evidence viewed

10  as a whole, presented an overwhelming case of Petitioner's guilt as to all three counts of arsons,

11  and it was objectively reasonable for the California Supreme Court to deny Petitioner's claim that

12  counsel committed cumulative errors resulting in prejudice under <u>Strickland</u>.  Accordingly, for

13  these reasons, Petitioner is not entitled to relief on Ground One.  As explained in detail below,

14  Grounds Two through Fifteen all fail for a lack of showing of incompetence.

15      2.      <u>Ground Two</u>

16          a.      <u>Alleged Twenty-Minute Window Defense</u>

17          As a subclaim of Ground Two, Petitioner contends that despite his advice, trial

18  counsel failed to create and/or present a sample timeline with regard to the surveillance on

19  August 26, 2001 involving the Powerhouse arson.  (SP at 32-33.)  Petitioner reasons that had a

20  defense agent driven along the particular route, made a stop, and then driven away in a certain

21  direction and speed, there would have been evidence that Petitioner was twenty minutes away

22  from the location of the fire when it was initially reported.  He contends such lapse of time would

23  have undermined the possibility of him using a time delay device because the cigarette-and-

24  matches time delay devices tested by the prosecution would have started a fire within five

25  minutes, and the inflamed area should have been greater than a ten-foot square after even the

26  fifteen minutes remaining after ignition from a time delay device.

27          Petitioner's claim fails on the merits as it is based on pure speculation and lacks

28  evidentiary support.  There is no evidence, at trial or here, that establishes there could have been

24

a showing of a twenty minute window so as to undermine the possibility that Petitioner was the perpetrator.  Although Petitioner presents his own assertions that an agent driving down the path could have established the twenty minute window, he has not presented any evidence that he or any other named individual was competent to testify to such finding.  Petitioner's claim amounts to nothing more than a conclusory allegation, devoid of factual support that could have been established at trial.  See Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000) (prisoner must present competent affidavits , i.e. sworn statements from the person who would have been able and willing to give admissible testimony, to reflect actual "helpful testimony for the defense" that counsel should have presented.); see also Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001).

Moreover, Petitioner's claim is simply illogical.  Hernandez provided clear and unequivocal testimony that he was within approximately one-half of a mile from the location where Petitioner stopped, and he observed the fire in a ten-foot square area from the time it took for Hernandez to reach the location after Petitioner left.  (RT 1744-1745.)  Furthermore the record contracts Petitioner's assertion that the prosecution's theory was that he used a time delay device.  (See RT 4022:12-14, 4084:25-26.)  Accordingly, it is certainly reasonable for the state court to reject Petitioner's claim that defense counsel should have presented evidence to establish that it took Hernandez twenty minutes to travel one-half mile to reach the location of the fire.

### b.   Failure to Impeach Rick Moore

In Ground Two, Petitioner also contends that trial counsel failed to properly impeach the testimony provided by Rick Moore.  Specifically, Petitioner contends that counsel should have demonstrated that Rick Moore "lied" when he stated that he observed the Powerhouse fire before anyone made him aware of it.  Petitioner contends that Moore heard about the fire prior to seeing it because Hernandez was the first to report it to dispatch.  However, Petitioner contends that Moore lied by testifying that he, not Hernandez, was the individual responsible for reporting the fire.

Petitioner's claim is based on a distortion of the actual testimony presented at trial.  At trial Moore initially indicated that on August 26, 2001, he observed the Powerhouse Fire before anyone made him aware of it.  (RT 2475.)  He later clarified that while he was performing air

surveillance of a separate major fire, he saw smoke but blew it off as being drift smoke from the main fire.  He then heard the radio report of the new fire and immediately responded.  (RT 2476.) Thus, Moore's testimony was clear that he did not make the initial report of the fire and responded only after hearing the radio report, and Petitioner's claim is contradicted by the record. (Id.)

Likewise, Petitioner's claim that Moore "lied" when testifying "that Petitioner pulled into a turnout heading back toward Fresno and was 'there by himself for a few minutes before being arrested'" is also unfounded.  Petitioner contends there was evidence that he was alone in the turnout for less than minutes.  The pertinent testimony by Moore provided the following:

Q.  You said on - directing your attention, you said you saw [Petitioner's] car pull into the - what turned out to be the arrest turnout and that a few minutes later you saw vehicles coming from both directions.  Were there no vehicles for a few minutes in the arrest turnout with [Petitioner]?

A.  That's correct.

Q.  So he sat in the arrest turnout for a few minutes before any other vehicles arrived?

A.  Yeah.  I don't know how long, but that's correct.  A short period of time.

(RT 2762.)

Thus, Moore's testimony was clear that he observed Petitioner in the turnout area alone for a "short period of time" and was not able to provide the actual duration of that time period. Accordingly, Petitioner's claim lacks any factual basis and is a meaningless distortion of the record.

3.    Ground Three

Petitioner contends that trial counsel was ineffective for failing to pursue a theory that Mike Weger was dishonest and/or that Weger planted the cigarette filter that was attributed to him.  As to this claim, Petitioner makes note of the fact that Weger (one of the fire personnel) claimed that he found a cigarette filter in the Powerhouse turnout and a pack of cigarettes in Petitioner's vehicle.  Petitioner further contends that counsel failed to use "three specific matters" demonstrating Weger's dishonesty or planting of evidence.

1                    a.      Opportunity to Plant Evidence, Mishandling of Evidence

2          As to this claim, Petitioner contends that the trial evidence showed (1) Weger had the

3 opportunity to plant the cigarettes, and (2) despite his experience, he mishandled the evidence

4 with bare hands, even though months later the prosecutor would rely on a theory (in Petitioner's

5 opinion) that a delay device was used in the Powerhouse fire.  (SP at 65-67.)

6          Even if Weger had the opportunity to plant the cigarettes and mishandled such evidence

7 with his bare hands, any claim of malicious official conduct on Weger's part was not supported

8 by sufficient evidence, it is rather a conclusion drawn by Petitioner from the evidence presented

9 at trial.  On cross-examination, Weger acknowledged that he mishandled the cigarettes he found

10 in Petitioner's vehicle and destroyed any potential exculpatory evidence which could have been

11 obtained.  (RT 1390.)  Thus, all of this was in evidence before the jurors, who were free to draw

12 from it whatever inferences they found warranted.  It is not the province of this Court to second-

13 guess the jury's finding or to re-weigh the evidence. Petitioner has failed to demonstrate that trial

14 counsel was constitutionally obligated to pursue a theory that Weger planted the cigarette

15 evidence.

16                    b.      DNA Evidence

17          Petitioner contends that counsel was constitutionally obligated to seek DNA testing of the

18 cigarette filter found at the Powerhouse turnout of various investigative personnel.  Petitioner

19 claims that defense counsel allegedly told him the court would deny such a request, yet the

20 prosecutor argued that nothing prevented such a defense request.  (SP at 67-70.)

21          The record reveals the reasonableness of counsel's decision to forego DNA testing of the

22 investigative personnel (which may or may not have been granted by the trial court).  During

23 closing argument, defense counsel argued that the prosecutor "made a huge deal out of this

24 cigarette filter all the way through her case."  (RT 4057.)  Counsel proceeded on the theory

25 (although not argued by the prosecution) that the prosecution's theory was that the person who

26 left the filter had used the rest of the cigarette to start the Powerhouse fire.  Counsel urged the

27 jury to accept that theory because Petitioner was not the donor of the DNA from the cigarette

28 filter.  (Id.)  Counsel reiterated that the DNA testing was done by the prosecution, and not the

1   defense. (Id.) Defense counsel used the lack of further testing to advance his theory, and argued,

2   "why didn't she [the prosecutor] find out whose DNA that is.  We know it's not Mr. Haag's."

3   (RT 4057-4058.)

4          In response, the prosecutor argued, that the filter did not match Mr. Haag and excluded

5   him.  The prosecutor further argued that if defense counsel had a specific person with whom they

6   wanted to compare DNA to, he was free to do so.  (RT 4083.)  Over defense objection, the trial

7   court admonished the jurors that they were "strictly" limited to the evidence that had been

8   presented (as opposed to what possibly could have been, but for whatever reason was not

9   presented).  (Id.)  The prosecutor continued that the theory that it was keeping secrets or not

10  doing its job in failing to conduct further testing was not the only explanation to be considered.

11  (Id.)

12         Thus, it was certainly reasonable to conclude that the defense counsel's reasonable

13  strategy was to attempt to profit from the lack of further testing.  Certainly, that strategy was only

14  viable if no further testing was done by defense, which very likely could have excluded the

15  investigative personnel.  Accordingly, it was objectively reasonable for the state court to

16  conclude that trial counsel was not constitutionally obligated to seek further DNA testing.

17                         c.    Alleged Participation in Petitioner's Interview

18         Petitioner also claims that Weger participated in Petitioner's interview.  (SP at 58.)  In

19  support of this claim, Petitioner presents a written motion by Garrick Byers (one of his defense

20  team) who asserted that he had read a transcript of the interview, and casually identified Weger

21  as being present during the interview.  (SP at 58-59; see CT at 429.)  In response, the prosecution

22  pointed out that Byers was not present during the interview and was not competent to make such

23  statement. (CT at 527 ("Defendant, through his counsel is speculating as to what is being said

24  and by whom.").)

25         Byers did not respond to the prosecution's accusation, and it is reasonable to assume that

26  had such response been false, he would have clearly done so.  Thus, these factual circumstances

27  support the conclusion that Byers did not have first hand knowledge of the fact that he alleged

28  Weger participated in the interview, and it was objectively reasonable for the state court to

conclude that defense counsel was not constitutionally obligated to explore such possibility. 28 U.S.C. § 2254(d).

4.   Ground Four

Petitioner contends that he was threatened during his custodial interview by investigators Ron Subia, Rusty Souza, and Mike Weger which was not reflected on the tape recording or transcript.

On cross-examination, Petitioner testified:

> Ron Subia and Rusty Souza were threatening me throughout that entire interview. . . . They were saying things like if I didn't admit to the Powerhouse fire that they were gonna charge me with two additional fires, and they came up with 168 and 180.  They said they were gonna put me away for 75 to life.  They were - - they were saying a lot of things.  And - - and there is a lot of it that's not in that interview.  And especially during the period of time that went by between the end of tape one and the beginning of tape two because they did not immediately start tape two.

(RT 3881-3882.)

Petitioner maintained that the tape-recorder was not running the entire time of the interview and there were things said to him that were not recorded.  (RT 3919.)  However, Petitioner acknowledged that he never listened to the tape-recording of the interview.  (RT 3921.) Petitioner indicated that in a certain unidentified transcript Ron Subia's name was omitted and replaced with Rusty Souza's name.  (RT 3922.)

Petitioner acknowledged that during the latter portion of the interview, Mr. Souza's voice became angry and the discussions became "heated."  (RT 3921-3922.)  Petitioner responded in "an angry and loud tone of voice as well."  (RT 3923.)  Petitioner became angry because he knew he was going to jail.  (Id.)  Petitioner acknowledged that he lied during the interview regarding going back to view the Highway 180 fire, but claimed he had good reason to do so since he was going to jail anyway.  (RT 3919, 3927-3928.)

On re-direct examination, Petitioner indicated that he was arrested at gunpoint by Agent Marion Mathews and Michael Weger was present during the arrest.  (RT 3928-3929.)  Petitioner again reiterated the interview continued when the tape was being changed.  (RT 3929.)  He also stated that Rusty Souza threatened to blame three fires on him unless he confessed to one fire.

(Id.)  In addition, Ron Subia threatened to "ruin" him in the press unless he confessed to the
Powerhouse fire.  (RT 3929-3930.)    Petitioner contends that in addition to two different
transcripts of the tape-recording of the interview, there were multiple other versions, and the
interview lasted substantially longer than four hours.  Petitioner contends counsel should have
deposed and presented at trial several unidentified individuals and a psychiatrist or psychologist
to testify to his mental state during the interview.

Despite his contentions to the contrary, Petitioner accepted and did not object to counsel's
characterization that the interview was approximately four hours.  (RT 3933-3934.)
Petitioner's claim that he was threatened by forestry investigators was fully presented to the jury
through his testimony, and any weight to give to the voluntariness of his confession/statements
was for the jury, not the court, to decide.  The fact that the jury convicted Petitioner on all
charges, and presumably gave little weight to such alleged threats, does not render counsel's
performance ineffective or demonstrate any resulting prejudice.  Further, Petitioner testified that
he never listened to the tape recordings and therefore has no first hand knowledge of such
contents.  Moreover, Petitioner has not presented any competent declarations to establish the
testimony of any unidentified witness, much less that he was prejudiced as a result of the failure
to call such witness.  Accordingly, the state courts' determination of this issue was not contrary
to, or an unreasonable application of, clearly established Supreme Court precedent.

5.    Ground Five

In Ground Five, Petitioner contends that Agent Marion Mathews transcribed the tape
recordings of his interview falsely, and counsel was ineffective for cross-examining Mathews
regarding the circumstances surrounding his arrest which reflected that she believed Petitioner to
be dangerous.

Petitioner again takes issue with the fact that he believes Mathews transcribed the tape
recordings and not a female employee of the California Department of Forestry.  Petitioner faults
counsel for failing to present the testimony of such transcriber.  In addition, Petitioner contends
counsel should have presented the testimony of public defender, Garrick Byers, who listened to
the original interrogation and transcription, an audio expert, and deputies who transported him

30

after the interview.  However, Petitioner has offered nothing more than conclusory allegations reflecting pure speculation.  Petitioner has failed to identify the witness, <u>U.S. v. Murray</u>, 751 F.2d 1528, 1535 (9th Cir. 1985), show that the witness was willing to testify, <u>U.S. v. Harden</u>, 846 F.2d 1229, 1231-32 (9th Cir. 1988), and show that the witness's testimony would have been sufficient to create a reasonable doubt as to guilt.  <u>Tinsley v. Borg</u>, 895 F.2d 520, 532 (9th Cir. 1990); <u>see also</u> <u>United States v. Berry</u>, 814 F.2d 1406, 1409 (9th Cir. 1989) (holding that where defendant did not indicate what witness would have testified to and how such testimony would have changed the outcome of the trial, there can be no ineffective assistance of counsel).  The absence of affidavits from uncalled witnesses puts a petitioner's claim at a disadvantage.  <u>Howard v. O'Sullivan</u>, 185 F.3d 721, 724 (7th Cir. 1999) ("failure to submit supporting affidavits from [the] potential witnesses would severely hobble [the petitioner's] case.") Accordingly, Petitioner's claim is without merit.

With regard to the cross-examination of Agent Mathews regarding the circumstances surrounding Petitioner's arrest, it was objectively reasonable to conclude counsel's examination was proper.  As part of his defense, Petitioner claimed that during the interview he was still experiencing the traumatization from the previous arrest by gunpoint.  As an attempt to validate Petitioner's defense, it was reasonable for counsel to elicit testimony from Mathews regarding the nature of her aggression during the arrest, and it cannot be said that counsel's actions were objectively unreasonable.  28 U.S.C. § 2254(d).

6.    <u>Ground Six</u>

In Ground Six, Petitioner again contends that counsel was ineffective regarding the presentation of the contents of the interview, and specifically challenges Rusty Souza's credibility.  Petitioner also claims that defense counsel was aware of "Scott Bachtelle" who was of the opinion that Souza engaged in "unorthodox work tactics" based on the fact a civil lawsuit was filed against him for "haphazard investigation" and "lying to favor the insurance company" and "fabricating evidence."

As with Petitioner's previous challenges, it was certainly reasonable for the state court to conclude that the claim is without merit based on the fact that the jury was well aware of the

1   conflicting testimony regarding the interview, of which it was charged to resolve.  In addition, to

2   the extent Petitioner contends that Scott Bachtelle could have provided expert testimony

3   regarding Souza's performance in another case, Petitioner fails to carry such burden under

4   California Evidence Code sections 800 (Lay witness; opinion testimony) and 801 (Expert

5   witness; opinion testimony).  In addition, Petitioner's claim amounts to nothing more than a

6   conclusory allegation regarding inadmissible third party hearsay evidence, and the claim is

7   without merit.

8          7.     Ground Seven

9          In Ground Seven, Petitioner contends that trial counsel was compelled to challenge the

10   illegality of the search of his vehicle because there was no warrant and should have argued that

11   Chris Launer altered evidence to incriminate Petitioner.

12          Petitioner's claim is without merit.  Petitioner has failed to demonstrate that there was

13   any basis to challenge the search of his vehicle.  Although officer's may not have obtained a

14   search warrant prior to the search, such was not needed because only probable cause is required

15   for a vehicle search, Maryland v. Dyson, 527 U.S. 465, 466-467 (1999); United States v. Ross,

16   456 U.S. 798, 799-800 (1982), and probable cause being present here, there is and was no basis

17   to challenge counsel's performance on this issue.

18          Petitioner takes issue with Launer's testimony that he found Marlboro cigarettes on the

19   seat of Petitioner's truck.  Although Mr. Launer testified that he observed a box of Marlboro

20   cigarettes on the front seat of Petitioner's truck, he did not handle or secure any of the evidence.

21   (RT 872-873.)  Accordingly, there was no basis to challenge such testimony any further, and

22   Petitioner's contention that counsel was ineffective for failing to accuse Launer of being a liar or

23   of altering the evidence fails under Strickland.

24          8.     Ground Eight

25          In Ground Eight, Petitioner contends that trial counsel was ineffective for failing to obtain

26   evidence relating to his location at the time of the Highway 180 fire on August 29, 2001.  As

27   raised to the state court, Petitioner faults counsel for failing to engage in certain investigatory

28   tactics.  All of Petitioner's claims fail for lack of evidentiary support.   First, Petitioner contends

that he requested trial counsel to drive a certain route at a certain speed, to stop at specific

locations, and to stay for certain amounts of time.  However, Petitioner fails to identify any

competent witness who declared a willingness to testify as to whether counsel performed such

investigation or what the results would have been had counsel done so.  Second, Petitioner

claims he requested counsel to obtain surveillance tapes and a cash register "memory" for August

19, 2001.  Petitioner again fails to identify any competent witness willing to testify as to whether

counsel in fact sought such information, and/or whether such information was in existence at the

time the request was made, or whether any specified person would have been in possession of the

alleged evidence and agreed to turn it over.  Third, he requested counsel interview certain private

and public employees regarding the times that they observed him.  As with the prior two claims,

Petitioner fails to proffer any competent witness willing to testify that counsel did not attempt to

conduct such interviews or that any of the alleged employees had information regarding the

observations.  Lastly, he raised certain opinions regarding the logistics of setting the Highway

180 fire by use of a "cigarette/match 'delay-action device.'"  However, Petitioner fails to present

any evidence in form of witness testimony to corroborate the fact that the Highway 180 fire was

started by a particular form of delay device or that there was any basis of personal knowledge

regarding the alleged opinions.  In light of the lack of evidentiary support, the state courts'

determination of this issue was not contrary to, or an unreasonable application of, clearly

established Supreme Court precedent.

Petitioner also challenges the fact that the jury heard evidence that someone else was

aware of the Highway 180 fire before he was, and faults counsel for failing to discover the

identity of this person.  He also contends there was no exact cause of the fire shown and no

physical evidence of an arson.  Petitioner's challenges amount to nothing more than a

disagreement with the jury's finding of guilt and there is no showing that counsel rendered

ineffective assistance.  Because Petitioner's claim lacks any foundation, the state courts'

determination of this issue was not contrary to, or an unreasonable application of, clearly

established Supreme Court precedent.  28 U.S.C. § 2254.

1    9.    <u>Ground Nine</u>

2    In Ground Nine, Petitioner challenges trial counsel's examination of witness Kurt

3 Luikart.

4    As explained by the state appellate court on direct review, Kurt Luikart observed

5 Petitioner at the scene of the Highway 168 fire on August 13, 2000, just shortly before the fire

6 began.  He also observed Petitioner at the fire suppression staging area an hour thereafter.  On

7 that day, Luikart assumed that Petitioner was a member of the press and did not contact police

8 until March 2001, after observing Petitioner at a Home Depot store and concluding that he

9 clearly was not a member of the press.  (Opinion, at 6.)

10    As presented to the state court, Petitioner raises a host of claims challenging counsel's

11 questioning of witness Luikart.  First, he contends that he submitted a list of proposed questions

12 to defense counsel to ask of Luikart, regarding why he did not report Petitioner's presence at the

13 scene until well after the day the fire started and regarding Luikart's driving on the day of the

14 Highway 168 fire.  (SP at 188, 191-193, 196-202.)  Petitioner contends that counsel rendered

15 constitutionally ineffective assistance for failing to question Luikart as he proposed.  There is

16 simply no Supreme Court authority that compels trial counsel to question a particular witness as

17 proposed by the defendant, and the state courts' determination of this issue was not contrary to,

18 or an unreasonable application of, clearly established Supreme Court precedent.

19    Second, Petitioner contests the fact that counsel elicited prejudicial testimony from

20 Luikart regarding the time frame in which he observed Petitioner at the Highway 168 fire.  (SP

21 206-207.)  Petitioner also contends that counsel rendered ineffective assistance by eliciting

22 testimony from Luikart that he later concluded that Petitioner was not a member of the press and

23 that he may have had a monetary incentive to identify someone as being connected to the fire.

24 (SP 214-218.)  There is simply no showing that counsel's tactical questioning on this matter

25 resulted in constitutionally ineffective assistance or that Petitioner was prejudiced.  Such

26 information was already disclosed to the jury on direct examination (see RT 2918-2928, 2939-

27 2944), and counsel merely subjected his responses for accuracy on cross-examination. In fact,

28 counsel's questioning appears reasonably sensible and relief is foreclosed under section 2254(d).

1

2

3       Third, Petitioner contends that the jury was presented with testimony that was

4   inconsistent with Luikart's account and the jury heard testimony that different people and

5   vehicles were present at the scene of the fire at some point after it started, and that someone who

6   saw Petitioner taking pictures at the scene could not identify him in Court.  However, the fact

7   that the jury was presented with additional testimony that may have been inconsistent, does not in

8   any way render counsel's actions ineffective.  In fact, the presentation of such evidence to the

9   jury allowed them to test the credibility of Luikart's account and consider such information in

10  determining whether to accept or reject his testimony.  In addition, Petitioner fails to present any

11  evidence based on personal knowledge regarding the identity or investigation of additional

12  persons or vehicles being present at the scene.  Accordingly, Petitioner's claim fails on the

13  merits.

14      Fourth, Petitioner contends that counsel could and should have made an investigation into

15  the traffic flow on Highway 168 by driving the route on a Sunday afternoon from 2:00 to 4:00

16  p.m. to impeach Luikart's testimony regarding the lack of traffic flow.  Petitioner further

17  contends that counsel could have examined the clothing at his home to determine what he was

18  wearing on August 13, 2000.  Petitioner's claims clearly lack merit.  Petitioner is simply not

19  competent to present such factual circumstances nor has he made any showing that, even if such

20  evidence was discovered, it was relevant to his criminal prosecution and would have been

21  admitted.

22      Fifth, Petitioner contends that there was evidence that at some unspecified time prior to

23  the fire, a volunteer firefighter made a statement about starting a fire for financial gain and the

24  person was a "very viable suspect."  (SP at 188-189, 194-196, 208-209.)  Again, this claim is

25  nothing more than a mere conclusion devoid of personal knowledge and based purely on hearsay

26  statements.  Petitioner fails to make any showing that counsel rendered constitutionally

27  ineffective assistance, and the state courts' determination of this issue was not contrary to, or an

28  unreasonable application of, clearly established Supreme Court precedent.

1    Sixth, Petitioner contends that counsel was incompetent for presenting the evidence of

2    Ron Subia's proffered ignition device.  However, the record is clear that counsel's strategy in

3    presenting such evidence was in attempt to bolster his defense theory that Subia falsified

4    evidence regarding the Highway 168 fire and possibly could have tainted the evidence in the

5    other fires.  The fact that counsel's trial strategy was ultimately rejected by the jury does not

6    render it unsound or constitutionally ineffective, and this fails under Strickland, 466 U.S. at 689.

7          10.    Ground Ten

8          As true of Petitioner's prior claims, in Ground Ten, he raises several assertions second-

9    guessing defense counsel's performance at trial.  First, Petitioner contends that counsel was

10   incompetent for presenting the evidence that Ron Subia found the remains of an incendiary

11   device at the Highway 168 fire, even though the prosecution had removed such evidence from its

12   case. Petitioner contends in conclusory fashion that Ron Subia's conduct tainted the entire case

13   against him.

14         At trial, Subia exercised his Fifth Amendment privilege against self-incrimination in

15   response to questioning by defense counsel.  (See RT 3176-3187.)  However, as previously

16   stated, the presentation of the fact that Subia found an incendiary device at the Highway 168 fire

17   reasonably related to his defense that the evidence was tampered and false.  Petitioner's claim

18   that Subia's conduct tainted his entire trial, is not based on personal knowledge and/or admissible

19   evidence, and Petitioner fails to demonstrate a Sixth Amendment violation.

20         Second, Petitioner contends that trial counsel filed motions without supporting authority

21   and was unprepared for court hearings on several occasions.  In particular, Petitioner claims that

22   a defense motion should have demonstrated that the trial prosecutor had "firsthand knowledge"

23   of Ron Subia's unlawful actions.  However, Petitioner has failed to identify any controlling

24   authority for the proposition that the trial prosecutor could be forced to testify in his case.  Nor

25   has Petitioner demonstrated a sufficient factual basis to support his claim that the prosecutor had

26   any "firsthand knowledge" relevant to his defense.  Accordingly, Petitioner has failed to

27   demonstrate counsel was incompetent in this respect.

28

Third, Petitioner contends that counsel should have called as a witness an unknown Walgreens employee who allegedly processed film from his camera in relation to this case. However, Petitioner has failed to make any showing that the unspecified Walgreens employee would have any memory of receipt or processing of film, or that the processing was in fact done by such employee.  Thus, Petitioner's claim fails for lack of evidentiary support.

Fourth, Petitioner contends that defense counsel should have challenged and prevented Ron Subia from asserting his Fifth Amendment privilege against self-incrimination.  It appears that Petitioner believes counsel could have requested that the trial court grant him immunity from any future criminal prosecution.  However, Petitioner has failed to identify any clearly established Supreme Court authority for such proposition, and the California Supreme Court has found it "doubtful" that trial courts have such authority.  See People v. Stewart, 33 Cal.4th 425, 468 (2004).

Finally, Petitioner asserts that defense counsel informed him that she was unaware of a basis upon which to obtain a new preliminary hearing on the ground that Ron Subia lied during the preliminary hearing.  As he did to the state court, Petitioner cites People v. Rosales, 153 Cal.App.3d 353 (1984), as authority for his claim.  To the extent the state court denied Petitioner's claim based on its review of state law, this Court must defer to California's interpretation of its own laws.  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).  "State courts are the ultimate expositors of state law."  Mullaney v. Wilbur, 421 U.S. 684, 691 (1975). Federal courts are bound by state court rulings on questions of state law.  Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989).  The only exception is the circumstance where the state court's interpretation is an obvious subterfuge to evade a federal issue.  Mullaney, 421 U.S. at 691; Peltier v. Wright, 15 F.3d 860, 862 (9th Cir. 1994).  There simply is no subterfuge here, and the Court must accept the state courts' construction of its own state law in denying Petitioner's claim.  In addition, it is reasonable to assume the state court could find that trial counsel sought to have the charge of arson on Count 4 (Highway 168 fire) dismissed outright, rather than seeking delay by trying to obtain another preliminary hearing.

37

In sum, as with Petitioner's prior claims, he fails to demonstrate that the state court was unreasonable to find that he failed to make a competent showing that defense counsel's representation fell below an objective standard of reasonableness.  See Strickland, 466 U.S. at 688.  Petitioner's unfounded and conclusory allegations fail to demonstrate a basis for relief under section 2254(d), and his claims are without merit.

11.   Ground Eleven

In Ground Eleven, Petitioner contends that counsel should have sought to exclude the entire interview precluding any statements regarding his prior history involving fires and childhood problems as extremely prejudicial.  Petitioner acknowledges that counsel achieved excluding all of the statements made by Petitioner and the copy of the entire transcripts were not produced for the jury.

It appears that Petitioner contends trial counsel failed to thoroughly argue and research the law regarding excluding the reference to his prior convictions.  Petitioner's claim amounts to nothing more than a disagreement with the trial court's ruling regarding the introduction of certain statements/admissions, couched in terms of ineffective assistance of counsel.  Disagreements with rulings under state law are not cognizable under section 2254.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.").  Moreover, to the extent Petitioner contends the court's ruling violated the Constitution, such claim is without merit.  See Alberni v. McDaniel, 458 F.3d 860, 866-867 (9th Cir. 2006).

12.   Ground Twelve

In Ground Twelve, Petitioner contends that trial counsel was ineffective in attacking the legality of the search of his residence.  However, Petitioner acknowledges that counsel challenged the validity of the search on the grounds that there was insufficient "knock" and "notice" and it was executed after 10:00 p.m.  Petitioner contends that the interview and presentation of the testimony of Richard Terronez (a member of the family who allowed Petitioner to reside in their home) was poorly done.  Petitioner further contends that counsel should have presented the testimony of the two other family members with whom he resided.

38

1   Petitioner's contention regarding the testimony of other Terronez family members

2   amounts to nothing more than mere speculation about inadmissible hearsay evidence.  In

3   addition, Petitioner makes no showing that the officer's alleged failure to comply with the

4   "knock" and "notice" requirement would have lead to exclusion of any seized evidence.  See

5   Hudson v. Michigan, 547 U.S. 586, 593-599 (2006).  Likewise, the mere fact that the warrant

6   was defective because of the hour in which it was served, would not justify suppression of any

7   resulting evidence.  See id., at 599 ("resort to the massive remedy of suppressing evidence is

8   unjustified" for violation of knock-notice rule).  Accordingly, the state court's rejection of this

9   claim was not objectively unreasonable under section 2254(d).

10      13.   Ground Thirteen

11   In Ground Thirteen, Petitioner raises numerous conclusory allegations regarding certain

12   witnesses he claimed counsel should have called to rebut the prosecution witnesses.  (Petition at

13   320-323.)

14   Yet again Petitioner has failed to submit any declarations detaining that the alleged

15   witnesses were willing and able to give admissible testimony (including testimony based on

16   personal knowledge) and specifically how the testimony would have been helpful to his case (not

17   the mere speculation that such testimony would be helpful).  Tinsley v. Borg, 895 F.2d at 532;

18   see also United States v. Berry, 814 F.2d at 1409; Howard v. O'Sullivan, 185 F.3d at 724.

19   Accordingly, Petitioner's claim is without merit and the state courts rejection of such claim was

20   not objectively unreasonable.  28 U.S.C. § 2254(d).

21      14.   Ground Fourteen

22   Petitioner contends that trial counsel was ineffective by failing to seek a different venue

23   for his trial due to the high degree of pretrial publicity.

24   In support of his contention Petitioner has submitted a copy of a change of venue motion

25   drafted by defense counsel that was never filed in the trial court.  (Exhibit I, Item 4, to Petition.)

26   In the motion, counsel argued that there was good cause for the need for a change of venue

27   "caused by a front page news article that appeared on the day jury selection was to begin,

28   yesterday, June 10, 2002."  (Id. at p.1.)  It was further stated that "[t]he news article appeared on

39

1    page 1, over the fold, of the 'The Fresno Bee,' the main newspaper in Fresno County.  The news

2    article claims that Haag is linked to the alleged arsons across the state of California and several

3    other states ranging as far East as Texas.  The article contains statements by Haag that are

4    inaccurate.  Most of these things are admissible at trial.  In short, the article 'convicts' Haag

5    without a trial."  (Id. at p.2 ¶ 2.)

6         Under the Sixth Amendment, a defendant facing criminal charges is entitled to be tried by

7    "a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  A change

8    of venue motion must be granted when the prejudicial pretrial publicity makes it impossible to

9    empanel an impartial jury.  Gallego v. McDaniel, 124 F.3d 1065, 1070 (9th Cir. 1997).

10   However, a "change of venue does not become necessary simply because of extensive news

11   publicity regarding the case."  Crater v. Galaza, 491 F.3d 1119, 1135 n.12 (9th Cir. 2007) (citing

12   Mu`Min v. Virginia, 500 U.S. 415, 430,431 (1991).  Accordingly, Petitioner bears the burden of

13   demonstrating that prejudice should be presumed or that actual prejudice exists due to the level

14   of pretrial publicity.  "Prejudice is presumed when the record demonstrates that the community

15   where the trial was held was saturated with prejudicial and inflammatory media publicity about

16   the crime.  Prejudice is rarely presumed because "saturation" defines conditions found only in

17   extreme situations.  To establish actual prejudice, the defendant must demonstrate that the jurors

18   exhibited actual partiality or hostility that could not be laid aside."  Gallego, 124 F.3d at 1070

19   (internal quotation marks and citation omitted).

20        Under California law, a change of venue is appropriate where the defendant demonstrates

21   that there is a reasonable likelihood in the absence of such relief, he cannot obtain a fair trial.

22   Cal. Pen. Code § 1033, subd. (a); People v. Navarette, 30 Cal.4th 458, 484 (2003); People v.

23   Jennings, 53 Cal.3d 334, 359 (1991).  In making such determination, the trial court reviews the

24   following five factors: "'the nature and gravity of the offense, the nature and extent of the news

25   coverage, the size of the community, the status of the defendant in the community, and the

26   popularity and prominence of the victim. [Citation.]'"  People v. Adcox, 47 Cal.3d 207, 231

27   (1988) (quoting People v. Harris, 28 Cal.3d 935, 948 (1981)).

28

40

Petitioner has failed to carry his burden of demonstrating that either that counsel acted professionally unreasonable or that he was prejudiced as a result.  There is no doubt that there was pretrial publicity regarding Petitioner and the instant case, including articles in the local newspaper and coverage on the local television news stations.  However, based upon a review of the record, it is apparent defense counsel's decision not to seek a change of venue was strategic.  Defense counsel called attention to the fact that the investigation in this case was tainted by the improper actions of Ron Subia.  To try this case to the jury in the very same locale in which Subia was employed could strategically work to Petitioner's advantage by seeking to inflame the emotions of the jurors who too resided in that locale.

Petitioner merely makes the conclusory and unfounded allegation that "all of the prospective jurors in the jury pool had prior knowledge of Petitioner's case."  (Petition, Ground Thirteen, at p.340.)  Petitioner presents no evidentiary foundation to support his vague assertion, and fails to demonstrate counsel was in any way constitutionally incompetent.  To the extent Petitioner contends that the jury panel was exposed to prejudicial media coverage during the trial.  Because there is no evidence to the contrary, this Court must presume that the jury followed the trial court's admonition to not read or listen to any news media regarding Petitioner's case or any arson case.

Moreover, Petitioner has failed to present any evidence to demonstrate there is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue if filed by defense counsel.  In addition, Petitioner simply fails to demonstrate that there was any difficulty encountered in selecting an impartial jury; rather, Petitioner's claims are based on pure speculation.  In addition, the reality is that the trial court thoroughly questioned all of the prospective jurors as to their exposure of the circumstances of the case through the various news channels, and repeatedly instructed the potential jurors to refrain from reading any information regarding the case.  (See Voir Dire Reporter's Transcripts, Lod. Doc. 93.)

15.   <u>Ground Fifteen</u>

Petitioner, yet again, raises several conclusory claims challenging trial counsel's competence, mainly with regard to his representation at sentencing.  First, he claims counsel failed to consult with him prior to declining to poll the jurors individually after finding him guilty of multiple counts.  However, Petitioner fails to demonstrate that every rational defense attorney would have found it useful or mandatory to seek such polling, or that anything beneficial would have resulted from the decision.  Accordingly, Petitioner's claim is clearly unfounded.

Second, Petitioner faults counsel for failing to file a motion for a new trial, and counsel advised Petitioner that there was no basis upon which to file such motion.  However, the grounds upon which Petitioner asserts counsel should have presented in the motion for new trial, are the same grounds found meritless herein.  Accordingly, there was no meritorious basis upon which counsel could or should have filed a motion for new trial, and his claims fails on the merits.

Third, Petitioner contends that the only verbal contact he had with counsel, after conviction and prior to sentencing, lasted only four minutes.  Again, Petitioner's claim is completely conclusory in nature.  He fails to demonstrate an inabililty to communicate in writing or some material fact of which he could not communicate.  Thus, even assuming Petitioner's allegation to be true, he fails to demonstrate any resulting prejudice by counsel's alleged misconduct.

Fourth, Petitioner contends that, despite having been granted extra time to do so, counsel failed to file a motion seeking dismissal of his prior convictions for sentencing purposes.  (SP at 346-347.)  To the contrary, the California Court of Appeal found that such motion was argued and was meritless under California law (California Court of Appeal Opinion, at 57-61 & Order modifying opinion), and Petitioner cannot challenge such ruling in this forum.  <u>Richey</u>, 546 U.S. at 76.

1    Fifth, Petitioner claims that none of his prior convictions qualified as "strikes" under

2  California law.[27] (SP at 353-355.) With the exception of his 1982 conviction, the state appellate

3  court upheld the trial court's findings on the prior conviction and such interpretation of state law

4  is binding upon this Court. California Court of Appeal Opinion, at 52-56; Richey, 546 U.S. at

5  76.    Sixth, Petitioner contends counsel should have argued that the Supreme Court's holding

6  in Apprendi v. New Jersey, 530 U.S. 466 (2000) barred use of his prior convictions because they

7  were predicated upon guilty pleas. (SP at 357-359.) Petitioner's claim is meritless because

8  nothing in Apprendi deals with the validity of a prior conviction that is based upon a guilty plea.

9    Seven, Petitioner claims that trial counsel should have argued that the imposition of a life

10 term constituted cruel and unusual punishment. However, considering the nature of Petitioner's

11 instant and prior offenses, such argument would have been meritless. See Ewing v. California,

12 538 U.S. 11, 30 (2003) (indeterminate life sentence based on past and present offenses "reflects a

13 rational legislative judgment, entitled to deference, that offenders who have committed serious or

14 violent felonies and continue to commit felonies must be incapacitated.").

15    Finally, Petitioner contends that counsel should have argued that the use of his prior

16 convictions as "strikes" violated the terms of his prior guilty plea agreements. (SP at 360-361.)

17 When a plea agreement rests in any significant degree on a promise or agreement of the

18 prosecutor, so that it can be said to be a part of the inducement or consideration, such promise

19 must be fulfilled. Santobello v. New York, 404 U.S. 257, 22 (1971). Here, there is no indication

20 that any promise *not* to use the 1977 or 1988 convictions was made during the plea negotiations.

21 Petitioner merely makes the conclusory allegation that such use of the prior convictions violated

22 his plea agreements. Thus, there is no basis for finding that such a promise was included in the

23 prior plea agreements, and the agreements were not violated by virtue of the current

24 enhancement. Moreover, the sentence imposed under Three Strikes is not additional punishment

25 for the prior convictions, but rather a stiffened penalty for the latest crimes. See Monge v.

26

27        [27] The California Court of Appeal found the trial court erred by finding true the strike and prior serious
felony enhancement allegations with respect to Petitioner's 1982 conviction for violating section 452(b)-unlawfully
28 causing a fire that an inhabited structure or inhabited property to burn. (Opinion, at 55.) These allegations were
stricken and Petitioner's sentence was modified. (Id. at 65.)

California, 524 U.S. 721, 728 (1998).

In addition, to the extent that Petitioner alleges that he had no knowledge at the time of his prior pleas of the possibility they could later be used to enhance a sentence, his claim must also fail.  Due process requires that a defendant be informed of all the *direct* consequences of a guilty plea.  Brady v. United States, 397 U.S. 742, 749 (1970).  There is no due process violation where a trial court fails to inform the defendant of *collateral* consequences, such as the potential for enhancement in the future.  United States v. Garrett, 680 F.2d 64, 65-66 (9th Cir. 1982).  Thus, Petitioner's lack of knowledge that the prior convictions could later be used to enhance a future sentence does not violate due process. Accordingly, any argument would have been futile and Petitioner's claim is without merit.

16.     Ground Sixteen

Petitioner contends that the prosecutor knowingly admitted false evidence in several different respects.  The knowing use of false or perjured testimony against a defendant to obtain a conviction is unconstitutional.  Napue v. Illinois, 360 U.S. 264 (1959).  Petitioner bears the burden of "alleg[ing] facts showing that there was knowing use of the perjured testimony by the prosecution."  Pavao v. Cardwell, 583 F.2d 1075, 1076-1077 (9th Cir. 1978).  In the context of the presentation of false evidence, Petitioner must prove all of the following: "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material."  United States v. Zuno-Arce, 339 F.3d 886, 889 (citing Napue, 360 U.S. at 269-271.)

The fact that there may be inconsistencies in certain witnesses statements and other conflicts in the evidence does not establish that the prosecution presented false testimony.  See e.g., United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995) (inconsistencies between testimony at trial and retrial did not amount to presentation of false testimony); see also United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997) ("that a witness may have made an earlier inconsistent statement, or that other witnesses have conflicting recollection of events, does not establish that the testimony offered at trial was false").

As to each of Petitioner's claims of admission of false evidence, Petitioner has failed to make any showing that there was false evidence in the possession of the prosecution.  Petitioner merely re-characterizes several of the claims raised previously as instances of prosecutorial misconduct based on the presentation of *false* evidence.  However, simply stated Petitioner presents several disagreements and potential discrepancies between witnesses' statements and/or testimony; however, such inconsistencies does not amount to prosecutorial misconduct.  Petitioner presents no evidence, beyond his own assertions, of actual declarations or affidavits from individuals stating their willingness and ability to testify from personal knowledge that the prosecution possessed false evidence, which was material and was not disclosed to the defense.[28]

---

[28]  In a related claim concerning conduct on the part of CDF Battalion Chief Ron Subia, the California Court of Appeal found no misconduct on the part of the prosecution stating:

> Here, there was no suppression or failure to disclose.  The record demonstrates that the prosecutor disclosed to the defense all information concerning Subia, which was known or imputed to her.  In addition, the trial court ordered disclosed to the defense information from Subia's personnel records, and overrode the claim of privilege made, pursuant to Evidence Code section 1040 et seq., by the officers who conducted the internal investigation into Subia's conduct.  [Petitioner] points to no information which should have been made available to him or presented to the jury but was not.

> ... However, [Petitioner] has failed to establish that the prosecution presented false evidence to the jury.  The People did not call Subia as a witness at trial; [Petitioner] attempted to do so, but Subia's assertion of his privilege against self-incrimination rendered him unavailable.  As a result, Subia's preliminary hearing testimony was read to the jury as part of the defense case.  The officers who conducted the internal investigation of Subia testified at length.  The fact Subia was fired from his job for dishonesty and falsifying documents was before the jury.  The misrepresentations on Subia's CV were fully disclosed to the jury and the true level of Subia's education and experience revealed.  The prosecutor did not place into evidence the ignition device Subia claimed to have found with respect to the Highway 168 fire; in fact, the prosecutor told the jury that the device found by Subia was not part of the People's case because Subia was not a believable witness.  The possibility Subia manufactured and planted the device was fully revealed and explored, despite the fact the investigators looking into Subia's conduct were unable to establish wrongdoing on Subia's part beyond poor investigative and documentation techniques.  Discrepancies in transcripts and reports – including Subia asking Day, on August 27 or 28, 2001, for assistance in preparing on a computer a preliminary investigation report for the Highway 168 fire, which Subia then directed be given the date of his original handwritten report – were also revealed and explored, as was the fact Subia surprisingly asked Matthews, who did not work for the lead agency (CDF) on the Powerhouse fire, to prepare a probable cause statement following [Petitioner's] arrest.  Although [Petitioner] attempted to insinuate that Subia himself started the Highway 168 fire and tampered with evidence relevant to all three fires (especially the photographs seized from [Petitioner's] camera and residence), the insinuation was based on innuendo and speculation.  So was [Petitioner's] suggestion that, given Subia's position, the credibility of the people working at his direction was therefore suspect.

> [Petitioner] relies on the "opportunity for misconduct," which he claims was "pervasive."

Thus, there is no basis to find that the state courts' rejection of this claim was contrary to or an unreasonable application of Supreme Court authority.  28 U.S.C. § 2254(d).

      17.    Ground Seventeen

          a.     Alleged Sua Sponte Duties of Trial Court

Petitioner contends that the trial judge was constitutionally required to sua sponte exclude certain evidence and argument.  His claim is, in large part, a re-characterization of his prior claims regarding ineffectiveness of trial counsel, as failures of the trial court as well.

The Supreme Court has recognized that a particular manner of proceeding does not constitute a due process violation upon a criminal defense when, despite the appointment of counsel, there is no trial-level objection to the challenged procedure.  See United States v. Gagnon, 470 U.S. 522, 527-529 (1985).  As recognized in Estelle v. Williams, where the Supreme Court stated:

> Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney.  Any other approach would rewrite the duties of trial judges and counsel in our legal system.

425 U.S. 501, 507 (1976).

As discussed *supra*, it was objectively reasonable for the state court to conclude that Petitioner failed to demonstrate that his trial counsel rendered constitutionally ineffective assistance of counsel.  Thus, it is likewise objectively reasonable to find that there is no basis of constitutional challenge to his claims which are re-cast as failings of the trial court.  The result is quite the contrary,

---

However, much of the physical evidence was identified by the witnesses who actually seized it.[fn]  Moreover, witnesses' testimony demonstrated that, despite Subia's position as incident commander/chief investigator (or perhaps because of it), he was frequently at the incident command post instead of at the scene of the fires or, when present, was there only for short periods of time.  What opportunity existed for tampering with evidence was fully presented to the jury.  [Petitioner] was placed at the scene of all three fires by witnesses other than Subia.  In short, unless we are prepared to conclude that the other witnesses all were lying – which, like the jury, we are not – Subia's opportunity for misconduct was speculative rather than pervasive, and was fully presented to the jury.  We will not find a violation of due process based on mere conjecture especially where, as here, the issues were fully presented to the jury and [Petitioner's] guilt was established independently of any taint.

(California Court of Appeal, Opinion, at 35-37.)

. . . the lawyer has – must have – full authority to manage the conduct of the trial." [Citation.] As to many decisions pertaining to the conduct of the trial, the defendant is "deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" [Citation.] Thus, decisions by counsel are generally given effect as to what arguments to pursue, [citation], . . . Absent a demonstration of ineffectiveness, counsel's word on such matter is the last.

New York v. Hill, 528 U.S. 110, 115 (2000); see also Allum v. Twomey, 484 F.2d 740, 744-745 (9th Cir. 1973) ("assuming the lawyer's competence, the client must accept the consequences of his trial strategy").   The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

b.      Challenge To Other Trial Court Rulings

Initially, to the extent Petitioner attempts to claim that his Fourth Amendment objection should have been sustained, such claim is not cognizable in this forum. Stone v. Powell, 428 U.S. 465, 494 (1976).

To the extent Petitioner challenges the admission of evidence of which the jury was left to determine the credibility, it was objectively reasonable for the State court to reject such claim. See Colorado v. Connelly, 479 U.S. 157, 168 (1986) (the possible admission of evidence that "might be proved to be quite unreliable, . . . is a matter to be governed by the evidentiary laws of the forum, . . . , and not by the Due Process Clause of the Fourteenth Amendment"; further, "'The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false.'").

The Constitution is not violated when issues relating to the truth of evidence is left to the trier of fact, and there is no requirement that the evidence be pre-screened by the trial judge to determine the reliability of such evidence. Watkins v. Sowders, 449 U.S. 341, 347 (1981) (when the question is "reliability" of evidence, the "proper evaluation" of that evidence is "the very task our system must assume juries can perform."). Thus, the Constitution guarantees a defendant the opportunity to present to the trier of fact all arguments and evidence for which they are to resolve. Moreover, in Watkins, the Court rejected the notion "that cross-examination is inadequate" to safeguard against possible unreliability. 449 U.S. at 348. The Court admonished that, "under our adversary system of justice, cross-examination has always been considered a

47

1   most effective way to ascertain truth." Id. at 349.  Due process is satisfied by the "time-honored

2   process of cross examination" which is "the device best suited to determine the trustworthiness

3   of testimonial evidence."  Id.; see also Faretta v. California, 422 U.S. 806, 818 (1975) ("The

4   rights to notice, confrontation, and compulsory process, when taken together, guarantee that a

5   criminal charge may be answered in a manner now considered fundamental to the fair

6   administration of American justice."

7       Third, to the extent Petitioner contends that the trial court erred in admitting evidence

8   based on the alleged prejudicial impact (SP at 420-422), it was objectively reasonable to deny

9   such claim.  See Romano v. Oklahoma, 512 U.S. 1, 11-13 (1994) (even in a capital case, "mere

10  admission of irrelevant and prejudicial evidence" provides no basis for setting aside judgment

11  under the guise of due process); see also Alberni v. McDaniel, 458 F.3d at 866-867 (no such

12  constitutional bar even under theory that such evidence proves propensity).

13      18.    Ground Eighteen

14      In Ground Eighteen, Petitioner continues to argue that the trial court abused its discretion

15  in admitting evidence which tended to demonstrate his "propensity" toward misconduct.

16  However, the California Court of Appeal rejected such claim stating:

17          We find no abuse here.  The evidence was not admitted to prove, or used
            for the improper purpose of proving, that [Petitioner] had a propensity or
18          disposition to commit arson.  (See *People v. Denis* (1990) 224 Cal.App.3d 563,
            567.)  The trial court reasonably determined the proffered evidence was relevant
19          to the issues of absence of mistake or accident, knowledge, and motive (Evid.
            Code, § 1101, subd. (b)), and more probative than prejudicial (Evid. Code, §
20          352).[fn] It mitigated the potential for prejudice by permitting the prosecutor to
            present only an "expedited and summarized" version, which the prosecutor did
21          through Matthews.  That [Petitioner] may have felt compelled to respond with a
            more detailed version of his history does not mean the trial court abused its
22          discretion in permitting the prosecutor to proceed as she did.

23  (California Court of Appeal, Opinion, at 44-45.)  Because this evidence served a proper purpose,

24  the state courts' determination of this issue was not contrary to, or an unreasonable application

25  of, clearly established Supreme Court precedent.  28 U.S.C. § 2254.

26      19.    Ground Nineteen

27      In Ground Nineteen, Petitioner contends, as a related claim to Ground Seventeen, that the

28  trial court should have excluded certain evidence, through a pre-screening process by the trial

1   judge to determine its reliability and/or accuracy rather than admitting the evidence and leaving it

2   to the defense to raise any arguments regarding the reliability and accuracy to the trier of fact.

3   (SP at 450-456.)  As discussed *supra*, the Constitution is not violated when issues relating to the

4   truth of evidence is left to the trier of fact, and there is no requirement that the evidence be pre-

5   screened by the trial judge to determine the reliability of such evidence, and it was objectively

6   reasonable for the state court to reject such claim.  28 U.S.C. § 2254.

7          20.   Ground Twenty

8          Petitioner contends that the trial court should have excluded his extrajudicial statements.

9   Petitioner claims the Constitution required the trial judge to sua sponte determine whether his

10  statements were voluntary.  (SP at 459-460.)  Again, as with the prior claim, the Constitution

11  does not require the trial judge to sua sponte determine the voluntariness of a defendant's

12  statements, and it was objectively reasonable for the state court to reject this claim.  28 U.S.C. §

13  2254.

14         21.   Ground Twenty-One

15         In Ground Twenty-One, Petitioner contends that the trial judge violated his right to

16  present a defense because Ron Subia appeared ready to testify on July 24, 2002, and had no

17  original intention of invoking his Fifth Amendment privilege against self-incrimination.  (SP at

18  463.)

19         The record discloses that on the morning of July 24, 2002, the parties appeared before the

20  trial court, outside the presence of the jury, to discuss the subject of Ron Subia's testimony.  (RT

21  3025.)  The court asked whether Subia had counsel and the prosecutor indicated she was not

22  sure.  (RT 3026.)  The court then asked defense counsel if Subia had given any indication that he

23  planned to exercise his right not to testify, and counsel responded there was no indication that he

24  planned to do so.  (Id.)

25         Ron Subia took the witness stand and was sworn.  (RT 3026.)  He indicated that he was

26  served a subpoena by defense counsel.  (RT 3028.)  The court asked Subia if it was his "desire to

27  testify in this case pursuant to that subpoena?"  (RT 3028.)  He responded that he did not

28  understand what was meant by "desire", and the court asked whether he had consulted an

1   attorney.  (RT 3028.)  Subia stated that he had not, and informed the court he did not understand

2   his "Constitutional rights" in relation to "the privilege against self-incrimination."  (RT 3028.)

3        The court proceeded to ask Subia why he had not spoken to any attorney, and he stated, "I

4   didn't feel that I needed to."  (RT 3028.)  The court then suggested that he consult an attorney

5   regarding his Constitutional rights. (RT 3029.)  The court expressed its difficulty in

6   understanding why Subia had not previously consulted an attorney regarding his testimony, and

7   Subia indicated he had been busy consulting with union representatives and was never advised of

8   the need to consult private counsel.  (RT 3029-3030.)  Subia was ultimately advised to consult

9   with an attorney before choosing to testify.  (RT 3030.)

10       Later that afternoon, Subia appeared back in court with appointed counsel.  The court

11  advised the parties to be ready on the following morning to resolve the issue of whether Subia

12  would invoke the privilege not to testify.  Subia's appointed counsel stated that "anything" that

13  was "relevant" to the parties' view would result in invocation of the privilege.  (RT 3152-3153.)

14       The next morning, on July 25, 2002, all the parties appeared, and Subia (who was present

15  with appointed counsel) was sworn and defense counsel was instructed to treat him as a witness

16  subject to examination.  (RT 3175-3176.)  After a few initial questions, defense counsel

17  proceeded to question him regarding the Powerhouse fire, and Subia invoked his privilege not to

18  answer.  (RT 3176-3177.)  Counsel continued to ask questions, and Subia continued to invoke

19  his privilege.  (RT 3177-3178.)  Over defense counsel's objection, the court subsequently found

20  further examination useless and upheld the privilege rendering him unavailable as a witness.

21  (RT 3184-3195.)

22       In claiming that Subia originally intended to not invoke the privilege, Petitioner simply

23  overlooks the fact that he did not want to testify and was present to testify because he was issued

24  a subpoena and was not aware of his right not to incriminate himself.  (RT 3028.)  Thus, it was

25  certainly objectively reasonable for the state court to conclude that Subia's desire to testify was

26  contingent upon his lack of knowledge of his Fifth Amendment right to not incriminate himself

27  by answering such questions.

28

Petitioner points to no clearly established Supreme Court authority to demonstrate that his constitutional rights were violated by the trial judge's advisement to Subia that he had a right not to testify. This case is factually distinguishable from the circumstances present in <u>Webb v. Texas</u>, 409 U.S. 95 (1972). There, the trial judge warned the sole defense witness as follows:

> 'Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the likihood (sic) is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.'

<u>Id</u>. at 96.

In contrast, here, Subia expressed his unwillingness to testify initially and was doing so only out of the lack of knowledge of his constitutional right not to testify. Unlike in <u>Webb</u>, the trial judge did not threaten that the witness should expect penal consequences for testifying favorably for the defendant; rather, the court appointed counsel to advise the witness. Additionally, Petitioner's claim is based on the erroneous premise that he had a right to take advantage of the mere ignorance of the witness as to his own constitutional right against self-incrimination. Thus, it was certainly reasonable for the state court to find that the factual circumstances present in this case are distinguishable from that in <u>Webb</u>, and no constitutional violation occurred.

     22.   <u>Ground Twenty-Two</u>

In his last claim, Petitioner contends that appellate counsel was ineffective in several respects.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. <u>Evitts v. Lucey</u>, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to <u>Strickland 's</u> two-pronged test. <u>Miller</u>

1   v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th

2   Cir.1986); see also Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 353-54 (1988) (holding that

3   where a defendant has been actually or constructively denied the assistance of appellate counsel

4   altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

5   that Strickland does apply where counsel is present but ineffective).

6          To prevail, Petitioner must show two things.  First, he must establish that appellate

7   counsel's deficient performance fell below an objective standard of reasonableness under

8   prevailing professional norms.   Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052,

9   2064 (1984).  Second, Petitioner must establish that he suffered prejudice in that there was a

10  reasonable probability that, but for counsel's unprofessional errors, she would have prevailed on

11  appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence

12  in the outcome. Id. The relevant inquiry is not what counsel could have done; rather, it is whether

13  the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th

14  Cir.1998). The presumption of reasonableness is even stronger for appellate counsel because he

15  has wider discretion than trial counsel in weeding out weaker issues; doing so is widely

16  recognized as one of the hallmarks of effective appellate assistance. Miller v. Keeney, 882 F.2d

17  1428, 1434 (9th Cir.1989).  Appealing every arguable issue would do disservice to the Petitioner

18  because it would draw an appellate judge's attention away from stronger issues and reduce

19  appellate counsel's credibility before the appellate court. Id.  Appellate counsel has no

20  constitutional duty to raise every nonfrivolous issue requested by petitioner. Id at 1434 n10

21  (citing Jones v. Barnes, 463 U.S. 745, 751-54, 103 S.Ct. 3308 (1983)).

22         As discussed above, there is no merit to Petitioner's claims that trial counsel was

23  ineffective and appellate counsel's failure to raise such issues on appeal could not have resulted

24  in prejudice to Petitioner.  Moreover, because the claims are without merit, appellate counsel's

25  decision to weed out "weaker" claims appears to be an objectively reasonable instance of

26  effective advocacy.

27         Petitioner also contends that appellate counsel failed to communicate with him in person

28  or to establish a "civil" or "working relationship" with him.  (SP at 471-472.)  However, it was

objectively reasonable for the State court to find that there was no Constitutional violation by the failure to establish such relationship.  The Sixth Amendment right to effective assistance of counsel at trial, exists only to ensure a "fair trial."  Appellate counsel's performance is evaluated under the Due Process Clause, not the Sixth Amendment.  In fact, the Supreme Court has plainly stated that "the Sixth Amendment does not apply to appellate proceedings."  Martinez v. Court of Appeal of California, Fourth Appellate District, 528 U.S. 152, 161 (2000).

After conviction, the defendant's role with appellate counsel is much more restricted than with trial counsel.  As noted in Martinez, "a lay appellant's rights to participate in appellate proceedings have long been limited by the well-established conclusions that he has no right to be present during appellate proceedings, . . . , or to present oral argument, . . ."  Martinez, 528 U.S. at 163-164.  In addition, the convicted person has no right to direct which claims the attorney will or will not raise on appeal.  Jones v. Barnes, 463 U.S. 745, 751-754 (1983).

There certainly is no Constitutional requirement that appellate counsel consult with the convicted individual in order to establish the claims to present on appeal.  The appellate process is strictly limited to the making of claims from an appellate record.  Thus, there is no clearly established Supreme Court precedent that requires appellate counsel to establish some form of "relationship" or to consult with the convicted individual in order to effectively represent him on appeal.  Based on the foregoing, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  28 U.S.C. § 2254.

ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.      The instant petition for writ of habeas corpus is DENIED;

2.      The Clerk of Court is directed to enter judgment in favor of Respondent; and,

3.      The court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c);
        Slack v. McDaniel, 529 U.S. 473, 484 (2000) (a COA should be granted where
        the applicant has made "a substantial showing of the denial of a constitutional
        right," i.e., when "reasonable jurists would find the district court's assessment of

53

1      the constitutional claims debatable or wrong"; <u>Hoffman v. Arave</u>, 455 F.3d 926,

2      943 (9th Cir. 2006) (same).  In the present case, the Court finds that reasonable

3      jurists would not find it debatable that the state courts' decision denying

4      Petitioner's petition for writ of habeas corpus were not "objectively

5      unreasonable."

6    IT IS SO ORDERED.

7    **Dated:**   **February 22, 2011**          **/s/ Dennis L. Beck**

                                       UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28